# 24-0842-cv(L), 24-0843-cv(XAP)

## United States Court of Appeals
### for the
## Second Circuit

FEDERAL INSURANCE COMPANY, FIREMAN'S FUND INSURANCE
COMPANY, NORTH RIVER INSURANCE COMPANY,

*Defendants-Appellants-Cross-Appellees,*

– v. –

AMERICAN PRECISION INDUSTRIES, INC.,

*Plaintiff-Appellee-Cross-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

## JOINT BRIEF AND SPECIAL APPENDIX FOR
## DEFENDANTS-APPELLANTS-CROSS-APPELLEES

MICHAEL A. KOTULA
RIVKIN RADLER LLP
926 RXR Plaza, West Tower
Uniondale, New York 11556
(516) 357-3000

– and –

STEVEN C. SCHWARTZ
CHAFFETZ LINDSEY LLP
1700 Broadway, 33rd Floor
New York, New York 10019
(212) 257-6960

*Attorneys for Defendant-Appellant-
Cross-Appellee Fireman's Fund
Insurance Company*

JONATHAN D. HACKER
JENYA GODINA
O'MELVENY & MYERS LLP
1625 Eye Street NW
Washington, DC 20006
(202) 383-5300

– and –

FRANK B. SLEPICKA
COHN BAUGHMAN
525 West Monroe Street, Suite 1500
Chicago, Illinois 60661
(312) 753-6639

*Attorneys for Defendant-Appellant-
Cross-Appellee Federal Insurance
Company*

*(For Continuation of Appearances See Inside Cover)*

 COUNSEL PRESS    (800) 4-APPEAL • (330138)

MEG F. CATALANO
CHRISTINA R. SALEM
KENNEDYS LLP
120 Mountain View Boulevard
P.O. Box 650
Basking Ridge, New Jersey 07920
(908) 848-6300

*Attorneys for Defendant-Appellant-
Cross-Appellee The North River
Insurance Company*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Defendant-Appellant Federal Insurance Company states that it is a wholly-owned subsidiary of Chubb INA Holdings LLC, which is 81.25% owned by Chubb Group Holdings Inc. and 18.75% owned by Chubb Limited. Chubb Group Holdings Inc. is a wholly-owned subsidiary of Chubb Limited. Chubb Limited is the ultimate parent and the only publicly traded company (NYSE: CB).  No publicly held corporation owns 10% or more of Chubb Limited's stock.

Defendant-Appellant Fireman's Fund Insurance Company states that it is a wholly-owned subsidiary of Allianz Global Risks US Insurance Company ("AGR US").  Eighty percent (80%) of the voting common stock of AGR US is held by Allianz of America, Inc., which is a wholly-owned subsidiary of Allianz Europe B.V., a wholly-owned subsidiary of Allianz SE.  Twenty percent (20%) of the voting common stock and one hundred percent (100%) of the non-voting preferred stock of AGR US is held by AGCS International Holding B.V., which is a wholly-owned subsidiary of Allianz Global Corporate & Specialty SE, a wholly-owned subsidiary of Allianz SE.  Allianz SE is a publicly held company that indirectly holds 10% or more of Fireman's Fund Insurance Company and its subsidiaries.

Defendant-Appellant The North River Insurance Company, a New Jersey corporation, states that it is 100% owned by United States Fire Insurance

i

Company, a Delaware corporation, which is 100% owned by Crum & Forster

Holdings Corp., a Delaware corporation, which is wholly-owned by Fairfax (US)

Inc., a Delaware corporation, which is 100% owned by FFHL Group Ltd. a

Canadian holding company, whose ultimate controlling parent is Fairfax Financial

Holdings, Limited, a Canadian Public Holding Company. Fairfax Financial

Holdings Limited is publicly traded on the Toronto Stock Exchange.

# TABLE OF CONTENTS

**Page**

JURISDICTIONAL STATEMENT ..................................................1

INTRODUCTION ........................................................................2

ISSUES PRESENTED FOR REVIEW ...........................................5

STATEMENT OF THE CASE.........................................................5

    A.    Factual Background...........................................................5

        1.    API's Corporate History and the Asbestos Lawsuits ...............5

        2.    The Policies ..................................................................7

    B.    Procedural Background .......................................................10

SUMMARY OF ARGUMENT ......................................................14

STANDARD OF REVIEW ..........................................................19

ARGUMENT .............................................................................19

I.    THE INSURERS HAVE NO DUTY TO DEFEND OR INDEMNIFY THE ASBESTOS LAWSUITS BECAUSE API IS NOT A DEFENDANT IN THOSE LAWSUITS.....................................20

    A.    Absent A Suit Against The Insured, There Is No Coverage Under the Policies .........................................................20

    B.    The District Court's Contrary Ruling Rests On A Misreading Of *Fitzpatrick* .............................................................25

        1.    *Fitzpatrick* Does Not Impose On Insurers A Duty To Defend Suits Not Filed Against The Insured..........................26

        2.    Even Under The District Court's Flawed Reading Of *Fitzpatrick*, There Is Still No Coverage...................................31

    C.    There Is No Need To Certify Any Question About The Plain Meaning Of The Policy Language ........................................34

II.    THE POLICY LANGUAGE COMPELS PRO RATA ALLOCATION OF DEFENSE COSTS WITH ALLOCATION TO API FOR UNCOVERED PERIODS.........................................35

    A.    Policy Language And Precedent Dictate That When Defense Costs *Can* Be Allocated On A Pro Rata Basis With Allocation To The Insured, They *Must* Be Allocated On That Basis.................38

iii

# TABLE OF CONTENTS
## (continued)

**Page**

    1.    The Language Of The Policies Requires Pro Rata Allocation of Defense Costs With Allocation To API For Uncovered Periods ...................................................38

    2.    Ample Precedent In New York And Elsewhere Supports Pro Rata Allocation Of Defense Costs ...................................41

B.    Even If Defense-Cost Allocation Were Discretionary, Failing To Order Pro Rata Allocation With Allocation To API Would Be An Abuse Of Discretion On This Record....................................47

C.    The District Court's Rationale For Adopting All Sums Allocation Is Meritless ........................................................49

D.    A Question Should Be Certified On The Defense Cost Allocation Issue Only If A Question Is Certified On The Named Insured Issue ........................................................51

CONCLUSION ...................................................................................52

iv

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*85-10 34th Avenue Apartment Corp. v. Nationwide Mut. Ins. Co.*,
  283 A.D.2d 604 (2d Dep't 2001) ..................................................21

*Admiral Ins. Co. v. Niagara Transformer Corp.*,
  57 F.4th 85 (2d Cir. 2023) .........................................................21

*Atl. Mut. Ins. Co. v. Greater N.Y. Mut. Ins. Co.*,
  241 A.D.2d 427 (1st Dep't 1997) ..............................................42

*Avondale Indus., Inc. v. Travelers Indem. Co.*,
  774 F. Supp. 1416 (S.D.N.Y. 1991).............................................42

*Certified Env't Servs., Inc. v. Endurance Am. Ins. Co.*,
  158 A.D.3d 1209 (4th Dep't 2018) .............................................22

*Columbus McKinnon Corp. v. Travelers Indem. Co.*,
  367 F. Supp. 3d 123 (S.D.N.Y. 2018)................................ passim

*Consol. Edison Co. of N.Y. v. Fyn Paint & Lacquer Co.*,
  2005 WL 139170 (E.D.N.Y. Jan. 24, 2005) ...............................49

*Consol. Edison Co. v. Allstate Ins. Co.*,
  98 N.Y.2d 208 (2002) ......................................................... 12, 36

*Cont'l Cas. Co. v. Rapid-Am. Corp.*,
  80 N.Y.2d 640 (1993) .................................................. 13, 40, 48, 49

*Danaher Corp. v. Travelers Indem. Co.*,
  414 F. Supp. 3d 436 (S.D.N.Y. 2019)............................... 43, 44, 46

*Fed. Ins. Co. v. Am. Home Assur. Co.*,
  639 F.3d 557 (2d Cir. 2011).......................................................19

*Fitzpatrick v. American Honda Motor Co.*,
  78 N.Y.2d 61 (1991) .............................................................. passim

*FSP, Inc. v. Societe Generale*,
  2003 WL 124515, at *5 (S.D.N.Y. Jan. 14, 2003), *aff'd and
  remanded*, 350 F.3d 27 (2d Cir. 2003)......................................22

*Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co.*,
  2010 WL 1257943 (N.D.N.Y. Mar. 25, 2010) .......................... 42, 45

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Generali-U.S. Branch v. Caribe Realty Corp.*,
  1994 WL 903279 (N.Y. Sup. Ct., N.Y. Cnty. Dec. 5, 1994)..............................44

*Goldberger v. Paul Revere Life Ins. Co.*,
  165 F.3d 180 (2d Cir. 1999)...............................................................................19

*Gulf Chem. & Metallurgical Corp. v. Assoc. Metals & Mins. Corp.*,
  1 F.3d 365 (5th Cir. 1993)........................................................................... 46, 50

*Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.*,
  876 A.2d 1139 (Conn. 2005) ..............................................................................30

*Henkel Corp. v. Hartford Accident & Indem. Co.*,
  399 F. Supp. 2d 607 (E.D. Pa. 2005) ................................... 21, 23, 29, 30

*Hicks v. Baines*,
  593 F.3d 159 (2d Cir. 2010)...............................................................................19

*High Point Design, LLC v. LM Ins. Corp.*,
  911 F.3d 89 (2d Cir. 2018).......................................................................... 28, 29

*In re Viking Pump, Inc.*,
  27 N.Y.3d 244 (2016) ........................................................................ 12, 13, 37

*Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*,
  633 F.2d 1212 (6th Cir. 1980) ..................................................................... 45, 46

*Keyspan Gas E. Corp. v. Munich Reinsurance Am. Inc.*,
  31 N.Y.3d 51 (2018) .................................................................................. passim

*Mt. McKinley Ins. Co. v. Corning Inc*,
  2012 N.Y. Misc. LEXIS 6531 (N.Y. Sup. Ct., N.Y. Cnty. Sept. 7,
  2012)............................................................................................................ 42, 45

*N. River Ins. Co. v. Duro Dyne Nat'l Corp.*,
  153 A.D.3d 844 (2d Dep't 2017) .......................................................................45

*Napoli v. Nat'l Sur. Corp.*,
  2022 WL 1943776, (S.D.N.Y. May 19, 2022), *R. & R. adopted*,
  2022 WL 2110606 (S.D.N.Y. June 10, 2022), *aff'd*, 2023 WL
  2320332 (2d Cir. Mar. 2, 2023) .........................................................................22

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Napoli v. Nat'l Sur. Corp.*,
  2022 WL 2110606 (S.D.N.Y. June 10, 2022), *aff'd*, 2023 WL
  2320332 (2d Cir. Mar. 2, 2023) .................................................... 21, 22

*Nat'l Grange Mut. Ins. Co. v. Cont'l Cas. Ins. Co.*, Slip Op. No. 85-
  5783 (S.D.N.Y. Feb. 11, 1987) ..........................................................40

*Nat'l Hockey League v. TIG Ins. Co.*,
  76 Misc. 3d 427 (N.Y. Sup. Ct., N.Y. Cnty. 2022) ...................... 39, 43

*Nat'l Union Fire Ins. Co. of Pittsburgh v. Roman Cath. Diocese of
  Brooklyn*,
  2017 WL 748834 (N.Y. Sup. Ct., N.Y. Cnty. 2017) ..........................42

*NL Indus., Inc. v. Com. Union Ins. Co.*,
  935 F. Supp. 513 (D.N.J. 1996) .........................................................44

*Olin Corp. v. Ins. Co. of N. Am.*,
  221 F.3d 307 (2d Cir. 2000).............................................................48

*Omni Quartz, Ltd. v. CVS Corp.*,
  287 F.3d 61 (2d Cir. 2002)................................................................19

*Owens-Illinois, Inc. v. United Ins. Co.*,
  650 A.2d 974 (N.J. 1994)...................................................................46

*Penguin Grp. (USA) Inc. v. Am. Buddha*,
  609 F.3d 30 (2d Cir. 2010)............................................................ 34, 51

*Roman Cath. Diocese of Brooklyn v. Nat'l Union Fire Ins. Co.*,
  21 N.Y.3d 139 (2013) ................................................................... 36, 39

*Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*,
  826 A.2d 107 (Conn. 2003) ..............................................................46

*Select Comfort Corp. v. Arrowood Indem. Co.*,
  2014 WL 4232334 (D. Minn. Aug. 26, 2014) ............................ 23, 24

*Spandex House, Inc. v. Hartford Fire Ins. Co.*,
  816 F. App'x 611 (2d Cir. 2020) .......................................................30

*Stein v. N. Assurance Co. of Am.*,
  2011 WL 13305251 (E.D.N.Y. Jan. 25, 2011) ...................... 23, 27, 29

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Towns v. N. Sec. Ins. Co.*,
964 A.2d 1150 (2008) ........................................................46

*Travelers Indem. Co. v. Fischbach, LLC, Ex-Fm, Inc.*,
2011 WL 1495196 (N.Y. Sup. Ct., N.Y. Cnty. 2011) ........................................43

*Travelers Indem. Co. v. Northrop Grumman Corp.*,
2013 WL 12325152 (S.D.N.Y. Nov. 4, 2013) ....................................41

*Uniroyal, Inc. v. Home Ins. Co.*,
707 F. Supp. 1368 (E.D.N.Y. 1988) ....................................45

*Vill. of Sylvan Beach v. Travelers Indem. Co.*,
55 F.3d 114 (2d Cir. 1995) ....................................19

**Statutes**

28 U.S.C. § 1292(b) ................................................ 1, 14, 34

28 U.S.C. § 1332 ................................................1

**Other Authorities**

Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance
Coverage Disputes* (21st ed. 2022) ............................................ 40, 47

Scott M. Seaman & Jason R. Schulze,
*Allocation of Losses in Complex Insurance Coverage Claims* App'x
A (50 State Survey of Allocation Decisions) (2024) ..........................................47

# JURISDICTIONAL STATEMENT

The district court had subject matter jurisdiction based on diversity of citizenship. 28 U.S.C. § 1332. Plaintiff-Appellee American Precision Industries, Inc., is incorporated in Delaware with its principal place of business in New York. Defendant-Appellant Federal Insurance Co. is incorporated in Indiana with its principal place of business in New Jersey. At the time Plaintiff filed its complaint, Defendant-Appellant Fireman's Fund Insurance Co. was incorporated in California with its principal place of business in California. Defendant-Appellant The North River Insurance Co. is incorporated in New Jersey with its principal place of business in New Jersey. The amount in controversy exceeds $75,000. Joint Appendix ("JA") 15.

This Court has jurisdiction under 28 U.S.C. § 1292(b). On December 21, 2022, the district court issued the interlocutory order from which this appeal is taken. Special Appendix ("SPA") 31. On November 20, 2023, the district court amended that order to certify the issues presented in this appeal for immediate appeal pursuant to 28 U.S.C. § 1292(b). SPA47. On April 3, 2024, this Court issued an order granting Defendants-Appellants' petition for leave to appeal under 28 U.S.C. § 1292(b). JA1433.

1

## INTRODUCTION

This appeal involves liability insurance policies issued by the Appellants (collectively, the "Insurers") to appellee American Precision Industries, Inc. ("API"), the sole named "insured" identified on the policies. API seeks coverage under the policies for several hundred asbestos-related lawsuits (the "Asbestos Lawsuits"), none of which names as defendant API or any other entity insured under the policies.

The first question presented is whether policy language providing coverage only for "suits against the insured" extends to lawsuits that do not name as a defendant any entity insured by the policy. The question should answer itself—it is flatly impossible to read language covering suits against the insured as encompassing suits that are *not* against the insured.

In a striking bout of candor and understatement, the district court admitted that its ruling extending coverage to API "stretched" the policy language "rather thin." SPA56. In fact, the ruling overrides the policy language altogether. And it misreads precedent as well. The district court relied entirely on *Fitzpatrick v. American Honda Motor Co.*, 78 N.Y.2d 61 (1991), but the suit at issue there *was* filed against the named insured, so affording coverage was consistent with the policy language providing coverage for suits against the insured. Not so here. The Asbestos Lawsuits here were not filed against API or any entity standing in its

2

shoes. The underlying defendants are all entities legally distinct from API with no rights whatsoever under API's liability policies. Because only API is an insured under the policies, and API is not a defendant in the Asbestos Lawsuits, the policies are categorically inapplicable to those suits.

If—but only if—this Court does treat the policies as extending coverage beyond their plain language to apply here, this appeal presents a second question about how to allocate the costs of defending the Asbestos Lawsuits. The Asbestos Lawsuits assert "long-tail" bodily injuries from asbestos exposure that occur over many years and implicate multiple successive insurance policies. The district court correctly held that the costs of *indemnifying* judgments and settlements of the suits must be allocated "pro rata" among the affected policies and the insured itself based on their respective proportion of time on the risk. But the court incorrectly held that the costs of *defending* the same suits must be allocated on a totally different basis, known as "all sums" or "joint and several" allocation, under which any one policy on the risk for any one period can be held responsible for *all* defense costs, even those attributable to injuries that occurred outside of the relevant policy's period. That ruling contravenes numerous New York decisions holding that when defense costs *can* be allocated on a pro rata basis, they *must* be allocated on a pro rata basis. The weight of authority outside New York has endorsed the same rule. If the Court reaches the question, it should endorse the

majority view and hold that where, as here, indemnity costs are subject to pro rata allocation—including allocation to the insured for damages or injuries occurring during self-insured, uninsured, underinsured, and insurer insolvent periods (collectively referred to hereinafter as "uncovered periods")—defense costs must be allocated on the same basis.

Finally, this Court has raised the question whether either or both of the foregoing questions should be certified to the New York Court of Appeals for resolution. The Insurers have no strong objection to certification, but they submit that it is unnecessary because the threshold coverage question is both easily answered and dispositive. As summarized above and elaborated in the body of this brief, there is simply no credible reading of the Insurers' policies that would extend coverage to the Asbestos Lawsuits because API is not named as a defendant in those suits. There is no need to certify a question with such an obvious answer. At a minimum, the Court should not *find* coverage without asking the Court of Appeals whether its decision in *Fitzpatrick* should be extended to mandate coverage beyond the circumstances of that case, and beyond the plain limits of the policy language. And if *Fitzpatrick* does not apply and the plain policy language controls, then the question regarding allocation is moot—absent coverage, there are no covered defense costs to allocate. The Court thus should certify the second

question only if the Court decides guidance is needed as to the scope of *Fitzpatrick* as well.

## ISSUES PRESENTED FOR REVIEW

1.     Whether policy obligations under a liability policy covering only suits filed against "the insured" are triggered by suits that are not filed against the insured or an entity standing in its shoes as successor, assignee, or alter ego (the "named insured issue").

2.     Whether insurers can be required to pay defense costs for long-tail claims on an all sums basis where the policy language limits indemnification to harms occurring during the policy period (the "defense-cost allocation" issue).

## STATEMENT OF THE CASE

### A.     Factual Background

1.     <u>API's Corporate History and the Asbestos Lawsuits</u>

The full details of API's corporate history are complicated, but the facts relevant to coverage and the instant appeal are straightforward and undisputed. API was formed in 1947 and manufactured products containing asbestos.  JA165 ¶¶ 6-7.  In 1996, API created, and transferred certain assets to, three corporate subsidiaries: API AirTech Inc. ("Airtech"), API Basco Inc. ("Basco"), and API Heat Transfer Inc.  JA166 ¶¶ 9-10.  The three entities later merged into a single entity known as API Heat Transfer Inc. ("Heat Transfer").  JA166-67 ¶¶ 10-12.  In

2000, Danaher Corporation ("Danaher") acquired all of the issued and outstanding shares of stock of API. JA167 ¶ 13.

In 2002, API sold Heat Transfer to API Heat Transfer Technologies Corporation ("Technologies Corp.") pursuant to a Stock Purchase Agreement ("SPA"). *Id.* API and Heat Transfer have had no affiliation since 2002. As part of the SPA, API formed a distinct subsidiary known as Heat Transfer Guarantee Co. LLC ("IndemniCo"). *Id.* ¶ 16. The SPA obligates IndemniCo to indemnify Technologies Corp. for suits alleging liability for bodily injury caused by exposure to asbestos-containing products manufactured, used, or distributed by the Heat Transfer entities prior to the closing of the SPA. *Id.* ¶ 17.

Since approximately 2002, hundreds of asbestos-related lawsuits have been filed against Heat Transfer. Some suits named Basco and Airtech as defendants as well. In all, 768 suits were filed against Heat Transfer, Basco, and/or Airtech. JA174 ¶ 38. Not one of the 768 suits for which API seeks coverage—the "Asbestos Lawsuits"—names API as a defendant. *Id.*[1] Indeed, during the more than twenty-one years that the underlying suits have been pending, the underlying plaintiffs' counsel have never amended the complaints or attempted to substitute API as a defendant.

---

[1] Only one suit was ever filed naming API as a defendant, but API does not seek coverage for that suit. JA174-75 ¶¶ 38, 41, 45.

Neither the SPA nor any other transactional agreement identified by API purports to assign API's insurance policies or coverage rights to Heat Transfer or Technologies Corp. or Danaher or any other entity. JA176 ¶ 49. But, as noted, the SPA does obligate IndemniCo to indemnify Technologies Corp. for asbestos-related lawsuits against the three Heat Transfer entities spun off by API. JA167 ¶ 17. API's parent Danaher has fulfilled IndemniCo's indemnity obligations, paying all defense and settlement costs for the Asbestos Lawsuits. JA175 ¶ 46. API now invokes its own liability policies to seek reimbursement for Danaher's (not API's) payments. JA174 ¶ 39.

>       2.    The Policies

API claims coverage under policies issued by three Insurers —Federal Insurance Company ("Federal"), The North River Insurance Company ("North River"), and Fireman's Fund Insurance Company ("FFIC")—whose policies collectively cover just over eleven years of a period of alleged injuries spanning the decades at issue in the Asbestos Lawsuits. The insurance policies at issue are five Federal policies covering the periods from April 1, 1992 to April 1, 1997, *see* JA238 (No. 3530-6700); one North River policy covering the period from December 31, 1974 to December 31, 1977, *see* JA555 (No. ML-208455); and three FFIC policies covering the period from December 31, 1985 to April 1, 1989, *see* JA563 (Nos. MXC 80005191, MXC 80079133, and MXC 80142927) (collectively,

"the Policies"). Outside of those eleven years and three months of coverage, and prior to December 31, 1974, API was uninsured either because it lacked insurance, lost its policies, or was insured by insurers who became insolvent. The Asbestos Lawsuits allege injuries not only during the time periods when the Policies were in effect but also during those years for which API cannot establish the existence of any collectible insurance.

Each of the Policies contains an insuring agreement that—subject to minor variations in phrasing not relevant here—limits coverage to "all sums which the insured shall become legally obligated to pay as damages because of bodily injury … to which this insurance applies." JA170 ¶ 28 (North River policy); *see also* JA171-73 ¶¶ 33, 35 (FFIC policies); JA252, 307, 371, 440, 534 (Federal policies). Each of the Policies explicitly limits coverage to bodily injury "which occurs during the policy period." JA171-73 ¶¶ 33, 35 (FFIC policies); *see* JA252, 307, 371, 440, 534 (Federal policies); JA170 ¶ 28 (North River policy). The policies define "bodily injury"—again, with minor variations not relevant here—as "bodily injury, sickness or disease sustained by any person which occurs *during the policy period*, including death at any time resulting therefrom." JA170 ¶ 28 (North River policy) (emphasis added); *see* JA678, 776, 903 (FFIC policies); JA271, 326, 390, 459, 547 (Federal policies).

8

The three Insurers' policies all expressly limit coverage to "the insured" in connection with "suits against the insured," and each policy names only API as "the insured," not any of the Heat Transfer entities. More specifically, the Federal policies apply only to liability for damages incurred by the "insured" and promise a defense only for "claims or suits against the insured." JA168 ¶ 22; *see* JA252, 257, 284, 307, 339, 371, 398, 440, 534 (1992-1996 Federal policies); *see also* JA536 (1996-1997 Federal policy) (promising to defend "any insured against a suit seeking damages for bodily injury" to which the insurance applies). A "suit" is defined in the Federal policies as "a civil proceeding in which damages because of bodily injury … to which this insurance applies are alleged." JA275, 330, 394, 463, 552. API is a named insured under each of the Federal policies. JA168 ¶ 22. None of the Heat Transfer entities is an insured under any Federal policy. *Id.*[2]

---

[2] The 1996-1997 Federal policy includes a clause providing coverage for "Subsidiaries or Newly Acquired or Formed Organizations." JA165 ¶ 4. That clause is not at issue here. API below belatedly moved to amend its complaint to seek coverage under this clause, but in an unchallenged order issued prior to the order now on appeal, the motion was denied as untimely and prejudicial. JA80-93; *see* SPA43-44 (citing prior denial of leave to amend). API did not seek § 1292(b) review of the prior order, and neither its response to the Insurers' motion for certification in the district court nor its own cross-petition for § 1292(b) review of the district court's December 21, 2022 order made any mention of the clause or of the earlier order denying leave to amend. The clause accordingly has no bearing in this appeal.

The North River policy likewise provides indemnity and defense only to "the insured" in connection with "suit[s] against the insured" on account of bodily injury "to which this insurance applies," and API is the sole named insured. JA169-70 ¶¶ 27-28.  No provision in the North River policy provides coverage to any API subsidiary, affiliate, or other entity.  JA169 ¶ 27.

Finally, the FFIC policies likewise cover only liability for damages incurred by "the insured" and promise a defense only for "suit[s] against the insured," with "suit" defined in Policy No. MXC 80142927 as "a civil proceeding in which damages because of bodily injury … to which this insurance applies are alleged." JA171-72 ¶ 33; JA905.  The policies list API and several other enumerated entities as named insureds, but they do not identify any of the Heat Transfer entities as named insureds.  JA174 ¶ 37.

### B.  Procedural Background

The Insurers moved for summary judgment in July 2020, arguing, *inter alia*, (1) that API cannot claim coverage under the Policies for the Asbestos Lawsuits because none of the suits name as API as a defendant, and (2) that, assuming coverage applies, the proper allocation rule for any of the Insurers' indemnity and defense obligations is pro rata allocation, including allocation to API for uncovered periods.  API opposed the Insurers' motions and filed its own cross-motions as to allocation and the Insurers' coverage obligations.

10

On August 4, 2021, Magistrate Judge H. Kenneth Schroeder, Jr., issued a Report, Recommendation, and Order ("RR&O") addressing each of the motions. SPA1.  In relevant part, the RR&O recommended finding that the Insurers were obligated to indemnify API for amounts it paid to compensate the plaintiffs in the Asbestos Lawsuits, and to reimburse API for defense expenses it incurred fulfilling contractual obligations to defend those lawsuits.  SPA19.  The RR&O further recommended finding that both indemnity and defense costs must be allocated on an "all sums" rather than a pro rata basis.  SPA26.

The Insurers filed joint objections to the RR&O, *see* JA1297, arguing, *inter alia*, that the Insurers owed no coverage to API for any of the Asbestos Lawsuits because none named API as a defendant, and that, in the alternative, the Policies' limitation of coverage to injuries occurring "during the policy period" mandates pro rata allocation of both indemnity and defense costs.  API opposed the Insurer's objections.  JA1341.

On December 21, 2022, the district court issued an order adopting the RR&O in part and overruling it in part.  SPA31.  The court agreed that the Asbestos Lawsuits triggered API's coverage under the Insurers' policies even though none of the suits was filed against API or any entity entitled to assert API's policy rights.  SPA35.  In the court's view, that conclusion was compelled by *Fitzpatrick v. Am. Honda Motor Co.*, even though the underlying action in

11

*Fitzpatrick* actually named the insured as a defendant.  Neither the court nor API cited any precedent from New York or any other jurisdiction applying a liability policy to a suit filed against a party who was not an insured under the policy or otherwise entitled to assert rights under the policy.

The district court rejected the RR&O in part on the allocation issues.  As to indemnity costs, the court correctly held that the "policy period" coverage limitation in the policies compelled pro rata allocation.   SPA42.  The court relied on a line of cases beginning with *Consolidated Edison Co. v. Allstate Insurance Co.*, 98 N.Y.2d 208 (2002) ("*Con Ed*"), in which the New York Court of Appeals set forth "the general rule under New York law" that pro rata allocation is required for "long-tail claim losses," where, as here, the "insurance policy language limits coverage to bodily injury or property damage that occurs 'during the policy period,'"  SPA36.  That language calls for pro rata allocation because it specifies that "the policies provide indemnification for liability incurred as a result of an accident or occurrence during the policy period, not outside that period," with proration "acknowledg[ing] the fact that there is uncertainty as to what actually transpired during any particular policy period."  *Con Ed*, 98 N.Y.2d. at 224.

In so holding, the court rejected API's contention that "all sums" allocation was required under a separate New York Court of Appeals decision, *In re Viking Pump, Inc.*, 27 N.Y.3d 244 (2016).  SPA39.  In *Viking Pump*, the Court of Appeals

12

fashioned an exception to the general rule that "during the policy period" language compels pro rata allocation when a policy also contains a "non-cumulation clause"—a provision the Court of Appeals construed as contemplating coverage beyond the policy period. *Viking Pump*, 27 N.Y.3d at 261. The Policies "do not contain non-cumulation provisions," SPA39, but API had argued that the Policies' definition of "bodily injury," which includes "death at any time," was the functional equivalent of such a clause. The district court disagreed, recognizing that "the 'death at any time' language is a far cry from *Viking Pump*'s clearly articulated non-cumulation clauses." *Id*. The court accordingly concluded that indemnity costs must be allocated under a pro rata scheme. SPA42.

As to allocation of defense costs, however, the court agreed with the RR&O that the "all sums" approach is required. SPA43. The court relied chiefly on *Continental Casualty Co. v. Rapid-American Corp.*, 80 N.Y.2d 640 (1993), even though the Court of Appeals in that case actually *deferred* any ruling on pro rata allocation to the insured because the record was not developed enough to establish injuries during uncovered periods, *see id.* at 656. Misreading *Rapid-American* as adopting a mandatory rule, the court concluded that "all sums allocation of defense costs is required in this case." SPA43.

FFIC and North River (later joined by Federal) subsequently filed a motion asking the district court to amend its order to certify the named insured and

defense-cost allocation issues for interlocutory appeal under § 1292(b).  JA12.

API filed an opposition and a cross-motion seeking § 1292(b) certification of the

indemnity-allocation issue.  *Id.*

On November 20, 2023, the district court issued its Certification Order

granting both motions and certifying the named insured, defense-cost allocation,

and indemnity-cost allocation issues for immediate appeal.  SPA47.  As relevant

here, the court reiterated that its determination of the named insured issue hinged

on what it believed to be "the logic of *Fitzpatrick*," while conceding that its

interpretation  "stretched" the policy language "rather thin."  SPA56.  With respect

to its ruling on allocation of defense costs, the court believed that the issue was "a

difficult matter of first impression" that had generated "conflicting authority."

SPA58.

The parties subsequently filed petitions pursuant to 28 U.S.C. § 1292(b) in

this Court, which granted the petitions on April 3, 2024.  JA1433.  As the

designated appellants, the Insurers submit this brief addressing the named insured

and defense-cost allocation issues, while API's arguments in connection with

indemnity-cost allocation will be addressed in API's cross-appeal.

## SUMMARY OF ARGUMENT

I.  API's claims fail at the threshold because API is not named as a

defendant in any of the Asbestos Lawsuits for which API seeks coverage.

A.  The Policies all unambiguously provide coverage only to "the insured" in connection with suits "against the insured."  Because none of the Asbestos Lawsuits names API as a defendant, none constitutes a suit "against API."  Abundant precedent in New York and elsewhere confirms that straightforward reading of this policy language.

B.  The district court's contrary ruling rested entirely on its misreading of the New York Court of Appeals' decision in *Fitzpatrick*.  That decision stands only for the proposition that, where there is *an existing suit against the insured*, courts may look to extrinsic evidence beyond the four corners of the complaint to determine whether that existing lawsuit could potentially result in covered liability against the insured.  *Fitzpatrick* has no application here, where the Asbestos Lawsuits are not filed against API, and thus there is no possibility—even considering extrinsic evidence—that those lawsuits will ever result in covered liability for API.

Even under the district court's incorrect reading of *Fitzpatrick*, there would still be no coverage here.  In the district court's view, *Fitzpatrick* mandates coverage where (1) the underlying plaintiffs' failure to name the insured as a defendant was a "mistake" likely to be corrected, and (2) the insurer is actually aware of facts revealing said "mistake."  Neither condition is satisfied here.  There is no basis to conclude that all 700+ underlying plaintiffs failed to name API by

15

"mistake" (rather than for a strategic reason), or that they will suddenly change course and name API despite having never done so over a twenty-one-year period. Indeed, API *cannot* be named in most of the Asbestos Lawsuits—all but approximately ten have already been resolved or settled. Nor is there any evidence that the Insurers were actually aware that plaintiffs made a "mistake"—rather than a strategic choice—in naming only the Heat Transfer entities as defendants.

C. Because the policy language and existing precedent are more than sufficient to predict that the New York Court of Appeals would reject coverage in these circumstances, certification is not necessary. This Court should certify a question on this issue only if it disagrees, because it should not consider extending *Fitzpatrick* to the very different circumstances of this case without seeking the Court of Appeals' input.

II. If this Court reaches the question of allocation, it should hold that the language of the Policies compels pro rata allocation of defense costs, with allocation to API for injuries occurring during uncovered periods.

A. The district court's hybrid approach—which called for pro rata allocation for indemnity but all sums allocation for defense costs—cannot be squared with the language of the Policies and ample precedent holding that where, as here, defense costs *can* be allocated pro rata, that method of allocation is required. The Policies expressly link the duty to indemnify and the duty to

16

defend—they provide both defense for suits and indemnification for damage only for bodily injury "to which this insurance applies," and the Policies' "insurance" applies only to bodily injuries occurring "during the policy period." In other words, *both* defense and indemnity obligations are limited by the Policies' "during the policy period" requirement. This language also dictates that, under the principles articulated by the New York Court of Appeals in *Keyspan Gas East Corp. v. Munich Reinsurance America Inc.*, 31 N.Y.3d 51 (2018), defense costs must be allocated to the insured for injuries occurring during uncovered periods.

In accordance with this policy language, courts in New York and across the country have routinely ordered pro rata allocation of defense costs in cases like this one and also have recognized that the insured must bear its pro rata share of those costs for uncovered periods. There is no reason to predict that the New York Court of Appeals would reject that strong weight of authority in New York and nationwide.

B. Even if pro rata defense-cost allocation is not mandatory in all cases, but can be a matter of discretion, it would be an abuse of such discretion not to adopt pro rata allocation on the record here. Imposing all sums allocation would force the Insurers to bear the costs for the extended periods of time where API lacks coverage for reasons that are not the Insurers' fault or responsibility. Because API has Policies from the Insurers here for only just over eleven years of the decades-

long period of injuries implicated by the Asbestos Lawsuits, all sums allocation in these circumstances would work the precise "unfairness" that *Rapid-American* and its progeny sought to avoid. While pro rata allocation of both defense and indemnification costs is required by the Policies' language, on the record here, the same result would obtain even if defense-cost allocation were a matter of discretion.

C. The district court's rationale for adopting all sums allocation of defense costs lacks merit. It relied primarily on *Rapid-American*, but failed to recognize that that case (1) merely deferred a ruling on immediate pro rata contribution from the insured in light of disputed factual issues, and (2) rested on the assumption— inapplicable in this case—that declining to immediately order pro rata allocation would not create "unfairness." The district court also improperly conflated the duty to *provide a defense* to an insured with the *apportionment of costs* in connection with that duty, thereby overlooking that pro rata allocation does nothing to detract from the defense duty itself and failing to give effect to the Policies' "during the policy period" limitation.

D. While existing New York decisions are sufficient to predict that the Court of Appeals would follow the nationwide weight of authority and require that defense costs be allocated pro rata, certification of this question is appropriate if this Court requires additional guidance on this question. As noted, however,

18

certification of this issue is proper only if this Court opts to certify the threshold named insured issue.

## STANDARD OF REVIEW

This Court reviews "de novo questions as to the ambiguity and meaning of the language of a contract, and as to the propriety of summary judgment. " *Omni Quartz, Ltd. v. CVS Corp.*, 287 F.3d 61, 64 (2d Cir. 2002) (citations omitted). Summary judgment is appropriate "if the moving party shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (internal quotation marks omitted).

"The New York approach to the interpretation of contracts of insurance is to give effect to the intent of the parties as expressed in the clear language of the contract." *Fed. Ins. Co. v. Am. Home Assur. Co.*, 639 F.3d 557, 567 (2d Cir. 2011) (internal quotation marks omitted). "If the provisions are clear and unambiguous, courts are to enforce them as written." *Goldberger v. Paul Revere Life Ins. Co.*, 165 F.3d 180, 182 (2d Cir. 1999) (quoting *Vill. of Sylvan Beach v. Travelers Indem. Co.*, 55 F.3d 114, 115 (2d Cir. 1995)).

## ARGUMENT

The Asbestos Lawsuits lack a foundational requirement for coverage under the Policies: none of them is a suit against the sole named insured, API, or against

19

any entity with a valid claim to API's coverage rights. API's coverage claim accordingly fails at the threshold as a matter of law. And while this Court has no need to reach the allocation of defense costs issue, the policy language and precedent make clear that, if the Insurers were to have coverage obligations under the Policies, defense costs must be allocated on the same basis as indemnity costs are allocated, i.e., on a pro rata basis, with API bearing its own costs for uncovered periods.

## I. THE INSURERS HAVE NO DUTY TO DEFEND OR INDEMNIFY THE ASBESTOS LAWSUITS BECAUSE API IS NOT A DEFENDANT IN THOSE LAWSUITS

API does not and cannot contest that neither API nor any other entity insured under its policies has been named as a defendant in any of the Asbestos Lawsuits for which it seeks coverage. Its theory of coverage, which the district court embraced, instead is grounded on the notion that because API *could* have been sued directly by the underlying plaintiffs, the Policies should cover API's obligations as if it actually *had been* sued directly. As the language of the Policies and ample precedent make clear, that contention is incorrect.

### A. Absent A Suit Against The Insured, There Is No Coverage Under the Policies

The controlling rule in this appeal is, as one court put it, "refreshingly simple": liability policies do not cover lawsuits where the "named defendants" in the suits "are simply not insured under the policies." *Henkel Corp. v. Hartford*

*Accident & Indem. Co*., 399 F. Supp. 2d 607, 611-14 (E.D. Pa. 2005). That rule

follows from the unambiguous policy language stating that coverage is provided

only to "the insured" in connection with a "suit" "against the insured." *See supra*

at 9-10. Under that language, this Court has observed, an insurer's duty to defend

"is triggered by [a] third party's filing suit *against the insured*," and the duty to

indemnify is triggered by "a determination of *the insured*'s liability to the third

party" in that suit. *Admiral Ins. Co. v. Niagara Transformer Corp*., 57 F.4th 85, 89

(2d Cir. 2023) (emphasis added).

New York courts have likewise consistently held that a liability policy is not

triggered where there is no suit against the insured or an entity that properly stands

in the insured's shoes under the policy. In *85-10 34th Avenue Apartment Corp. v.

Nationwide Mutual Insurance Co*., 283 A.D.2d 604 (2d Dep't 2001), for example,

the court rejected coverage under a policy endorsement that named as insureds

only the directors and officers of a co-op, where "no directors or officers were

named as defendants in the underlying action," *id.* at 605.

More recently, in *Napoli v. National Surety Corp*., 2022 WL 2110606

(S.D.N.Y. June 10, 2022), *aff'd*, 2023 WL 2320332 (2d Cir. Mar. 2, 2023), this

Court affirmed a ruling rejecting coverage where an insured was "mentioned by

name in the [underlying] complaint's allegations," but the complaint "neither

name[d]" the insured "as a defendant nor br[ought] any claims against her," 2022

21

WL 2110606, at *1.  In holding that coverage did not apply, the district court adopted the recommendation of a magistrate judge who agreed with the insurer that "no coverage obligation exists" because there was "no lawsuit against [the insured] to defend or indemnify."  *Napoli v. Nat'l Sur. Corp.*, 2022 WL 1943776, at *6 (S.D.N.Y. May 19, 2022), *R. & R. adopted*, 2022 WL 2110606 (S.D.N.Y. June 10, 2022), *aff'd*, 2023 WL 2320332 (2d Cir. Mar. 2, 2023).

Numerous other New York decisions are in accord.  *See*, *e.g.*, *Certified Env't Servs., Inc. v. Endurance Am. Ins. Co*., 158 A.D.3d 1209, 1211 (4th Dep't 2018) (criminal action against insured did not qualify as  "suit," even though it "could have resulted in civil claims" being asserted against insured in the future; accordingly, "[i]nasmuch as there was no suit against [insured]," insurer had "no duty to provide a defense"); *FSP, Inc. v. Societe Generale*, 2003 WL 124515, at *5 (S.D.N.Y. Jan. 14, 2003) (holding that insurer had "no duty to defend against any actions that do not currently exist"), *aff'd and remanded*, 350 F.3d 27 (2d Cir. 2003); *Columbus McKinnon Corp. v. Travelers Indem. Co*., 367 F. Supp. 3d 123, 151 (S.D.N.Y. 2018) (finding no duty to defend as to "cases in which [the insured] has not, and may never be, directly named" and precluding any defense duty "[u]nless and until" insured was actually "named directly" in underlying suit (quotation and alteration omitted)); *Stein v. N. Assurance Co. of Am*., 2011 WL

13305251, at *15 (E.D.N.Y. Jan. 25, 2011) (insurer "had no duty to defend [plaintiffs] given that there was no 'suit' against them").

Courts in other jurisdictions likewise agree that no coverage exists when no suit is asserted against the insured or an entity standing in its shoes. The analysis in *Henkel*, *supra*, is especially instructive. In that case, Permatex Company Inc., which distributed asbestos-containing products, had merged into Loctite, which created entities known as Permatex Industrials Corporation and Permatex Inc. ("Permatex Entities"), and then was succeeded by *Henkel Corp*. 399 F. Supp. 2d at 610, 612-13. Eventually, asbestos injury suits were brought against the Permatex Entities, and Henkel sought coverage for the suits under policies that had been issued to Loctite. *Id.* Henkel argued that the plaintiffs had "'mistakenly' named" the Permatex Entities rather than Loctite, which had manufactured the relevant asbestos products. *Id.* at 612. The court rejected that argument and held that the insurers correctly denied coverage, because whatever liability Loctite theoretically might incur in a different suit, the defendants actually named were "simply not insured under the policies." *Id.* at 613-14. The same analysis applies here.

Another decision to similar effect is *Select Comfort Corp. v. Arrowood Indemnity Co.*, 2014 WL 4232334 (D. Minn. Aug. 26, 2014). The court there held that an insurer "did not have a duty to defend" where, as here, "the insured … was

23

not a defendant" in the underlying action, such that "no judgment against it would result from that action obligating it to pay damages." *Id.* at *8. The court reached that conclusion even though there "may have been a good chance that [the insured] would have been added as a defendant" if the underlying action had continued. *Id.* The court was unpersuaded by the contention that "corporate entity distinctions should be disregarded" in order to find a duty to defend. *Id.* at *9. Again, the same analysis applies here.

As these precedents confirm, there is simply no reasonable reading of policy language covering suits "against the insured" as covering suits that are *not* filed against the insured. That rule categorically precludes coverage here. The Asbestos Lawsuits do not name API as a defendant. And the defendants they do name—the Heat Transfer entities—are not insured under API's policies, but are legally distinct entities that do not and could not assert API's rights under the Insurers' policies. Because the Asbestos Lawsuits are not suits "against the insured," the Policies simply do not apply to them.

The suggestion in the court's certification order that the Insurers had "notice that [API] retained liability for the harms alleged" in the Asbestos Lawsuits (SPA62) is both irrelevant and wrong. The "retained liability" phrase can refer only to API's purported contractual obligation to *indemnify* the Heat Transfer entities for *their* liabilities in the Asbestos Lawsuits. But API below correctly

24

disavowed any effort to obtain coverage on the basis of any contractual duty to indemnify the Heat Transfer entities. *See* SPA20 n.5. As the Insurers showed below, the Policies' limited coverage for contractual obligations does not apply to API's contractual duties to indemnify the Heat Transfer entities' Asbestos Lawsuits liabilities. *See* Dkt. No. 90-45 at 20-24. And in any event, API in fact *has no* indemnification duty—that obligation was imposed on IndemniCo, a legally distinct entity. *See supra* at 6. For these reasons, the Insurers' supposed "notice" of API's "retained liability" has no bearing here.

What matters is that the Insurers' Policies provide insurance only for suits "against the insured," and none of the Asbestos Lawsuits was filed against API. The only defendants in those suits are legally distinct entities with no rights whatsoever under the Policies. The Insurers thus have no duty to defend or indemnify those suits.

**B.     The District Court's Contrary Ruling Rests On A Misreading Of *Fitzpatrick***

In the face of the clear policy language and abundant case law authorizing coverage only for a suit against an insured entity, the district court concluded that coverage was compelled here—even absent a suit against API—by the "logic" of the New York Court of Appeals' decision in *Fitzpatrick v. American Honda Motor Co.*. SPA56. Not so. *Fitzpatrick* has no relevance to this case.

1.   Fitzpatrick Does Not Impose On Insurers A Duty To Defend Suits
     Not Filed Against The Insured

The district court read *Fitzpatrick* as establishing that under New York duty-to-defend principles, an insurer may have a duty to defend a complaint that does not name an insured as a defendant, *if* the complaint simply failed to name the insured party by "mistake" and the insurer is aware of "extrinsic" evidence identifying the insured as the correct defendant.  *See* SPA34-35.  That analysis is quite incorrect.

a.  In *Fitzpatrick*, the underlying plaintiff sued an individual who was insured as an officer of his company, but the complaint "accidentally mischaracterized his role" at the company and "mistakenly" identified him as an employee, rather than as an officer.  78 N.Y.2d at 69.  The insurer denied coverage on the ground that the complaint's allegations, by their terms, did not establish a potentially covered claim, because they identified the defendant only in his non-insured capacity.  The court held that while the duty to defend normally depends only on the allegations within the "four corners" of the underlying complaint, the duty may arise "where the pleadings do not allege a covered occurrence but the insurer has actual knowledge of facts demonstrating that the lawsuit does involve such an occurrence."  *Id*. at 63.  A duty arose in that case, the court emphasized, because the insurer actually knew the defendant was an insured officer with a contractual right to a defense, and thus denying the insured a defense to the suit

26

against him "would be to afford the insurer an undeserved windfall at the expense of its insured." *Id.* at 69. Further, the court added, "relieving the insurer of its duty to defend" would be "particularly imprudent and counterproductive," because the plaintiff was "likely" to become aware of her error and to correct it. *Id.*

*Fitzpatrick*'s analysis and holding have no application here.

First, and most importantly, the underlying lawsuit in *Fitzpatrick*—unlike the Asbestos Lawsuits—was actually filed against an insured person. The distinction makes a critical difference because, as *Fitzpatrick* explained, the insurer contractually "promised to 'defend any suit *against the insured* seeking [covered] damages." *Id.* (emphasis added). The suit on its face thus directly implicated the insured's contractual right to a defense against suits filed against it. As one court later explained, "in *Fitzpatrick*, there was a complaint expressly naming the defendant," such that *Fitzpatrick* involved extrinsic facts establishing the possibility of coverage "*predicated on the existing lawsuit*" against the insured person. *Stein*, 2011 WL 13305251, at *16 (emphasis added).

Here, by contrast, the existing lawsuits do not name API in any capacity at all, so no contractual right belonging to API is implicated in any way. *See supra* at 6, 24. As another court put it, *Fitzpatrick* in no way suggests that where—as here—the insured "has not [been], and may never be, directly named" in the

27

existing suit, the insurer nevertheless must provide a defense to that suit.
*Columbus McKinnon*, 367 F. Supp. 3d at 151.

Second, the district court fundamentally misunderstood the two principles applied in *Fitzpatrick*: (1) that a duty to defend arises whenever there is a "reasonable possibility" that a complaint could result in covered liability, and (2) that facts extrinsic to the four corners of a complaint sometimes can give rise to a duty to defend. 78 N.Y.2d at 65, 67. Consistent with the policy language providing coverage for suits "against the insured," these principles mean only that *when the insured is actually sued*, a duty to defend may arise if—taking relevant extrinsic evidence known to the insurer into account—there is a reasonable possibility that covered liability could be imposed on the insured *in that suit*. Neither these principles, nor anything else in the Policies, imposes an obligation to defend a suit that is *not* filed against the insured, but *could* be, if the underlying plaintiffs one day chose to file a new or amended complaint that actually named the insured as a defendant.

The principles articulated in *Fitzpatrick* are illustrated by this Court's decision in *High Point Design, LLC v. LM Insurance Corp.*, 911 F.3d 89 (2d Cir. 2018). In that case, an existing suit was already filed against the insured, and the court found that a duty to defend that suit was triggered by extrinsic evidence in the form of discovery demands that made clear that the suit could yield liability

qualifying as covered damages for "advertising injury" under the policy. *Id.* at 91-92. In other words, the court extended the duty-to-defend inquiry beyond the four corners of the complaint, allowing for consideration of the discovery demands that illuminated the nature of the claims at issue, and determined that the insurer's duty to defend attached at the point when it became aware of those extrinsic materials. *Id.* at 92, 96-98. The analysis in *High Point* is the kind of analysis contemplated in *Fitzpatrick*—not the freewheeling speculation about *other* suits that *could* be filed that the district court undertook here.

Other courts have repeatedly recognized that *Fitzpatrick*'s beyond-the-four-corners principle is irrelevant to a case like this one, where there is simply no suit filed against the insured. For example, the *Henkel* court dismissed the "four corners" argument as a "red herring" in that case because "no amount of extrinsic evidence" could "change the fact that the entity sued in the underlying action are not insureds under the policies." 399 F. Supp. 2d at 614; *see also Columbus McKinnon*, 367 F. Supp. 3d at 150-51; *Stein*, 2011 WL 13305251, at *16. The same is true here: no amount of extrinsic evidence will change the facts that (a) the Heat Transfer entities—the only entities named in the Asbestos Lawsuits—are not insureds under API's policies, and (b) API itself could *never* be sued in the vast

majority of Asbestos Lawsuits, almost all of which have already been resolved. *See* JA989-1169.[3]

b. The district court's view that coverage can apply merely because *different* lawsuits *could* have been filed would yield absurd consequences. By unmooring the inquiry as to whether there is a "reasonable possibility of recovery" from the existing lawsuit, the district court's approach would result in a virtually unbounded duty to defend. This Court has already rejected such a result, explaining in *Spandex House, Inc. v. Hartford Fire Ins. Co.*, 816 F. App'x 611 (2d Cir. 2020), that a duty to defend does not arise merely because a "theoretical basis for coverage" might arise if an existing complaint were "fundamentally transformed and restructured." *Id.* at 615 (emphasis omitted). If coverage could attach based on such a frail premise, this Court explained, "the duty to defend would be essentially limitless, as a third party's complaint could always be amended in the future to add a covered claim"—or, as here, an insured defendant—"for the first time." *Id.* As *Spandex House* makes clear, while the duty to defend is of course

---

[3] API below sought to distinguish *Henkel* on the incorrect ground that it applied Pennsylvania law. *See* JA1352. In fact, the court declined to choose between Pennsylvania and Connecticut law, finding no "actual conflict" between their laws on the relevant issues. *Henkel*, 399 F. Supp. 2d at 611. And Connecticut law is identical to New York law. *See Hartford Cas. Ins. Co. v. Litchfield Mut. Fire Ins. Co.*, 876 A.2d 1139, 1146 (Conn. 2005) (adopting *Fitzpatrick* caveat to four-corners rule).

broad, it is not so capacious as to be triggered when critical features of an underlying action—aspects as foundational as whether the insured is actually named as a defendant—would have to change fundamentally to implicate the policy language.

    2.    <u>Even Under The District Court's Flawed Reading Of *Fitzpatrick*, There Is Still No Coverage</u>

As shown above, the district court construed *Fitzpatrick* to mandate that coverage is triggered, even absent a suit against the insured, so long as (1) the underlying plaintiff omitted the insured as defendant purely by a "mistake" that is likely to be corrected, and (2) the insurer has actual awareness of facts revealing said "mistake" and identifying the correct defendant. That reading is incorrect for all the reasons just stated, but even if *Fitzpatrick* did compel coverage in those circumstances, they do not exist here. There is no basis whatsoever for concluding that all 700+ plaintiffs in the Asbestos Lawsuits made a "mistake" in failing to name API, or that they will change course and actually name API after years—and sometimes decades—of litigation. And of course they *cannot* now name API in the vast majority of cases, because they have been resolved. *See* JA989-1169.

The district court assumed such a "mistake" occurred based solely on API's assertion that the suits all arise from injuries from API products. SPA34-35. But even if the assertion were true, there would be no basis for assuming that the Heat Transfer entities themselves could not be held liable for the claims asserted against

them.  The allegedly injured plaintiffs and their counsel obviously believe—and have expressly alleged—that the Heat Transfer entities *are* legally responsible for injuries caused by products manufactured and distributed by API before it spun the entities off.  And in at least three cases, the Heat Transfer entities did not prevail on liability defenses they raised and instead paid settlements to resolve suits.[4] These settlements confirm what was already clear: the plaintiffs did not need to name API as a defendant in the Asbestos Lawsuits, but could and did obtain relief from the named non-API defendants.

Nor did the district court identify any basis for concluding that API was a necessary party in the Asbestos Lawsuits, which if true would place plaintiffs' counsel at risk of malpractice for such a critical "mistake" in failing to include API as a defendant.  To that point, it is telling that plaintiffs in those 700+ lawsuits over a twenty-one year period *still* have not amended any complaints to add API as a defendant.  Nor have any of the Heat Transfer entities either sought dismissal of any complaint for failure to sue API or moved to implead API.  To the contrary, as already noted, the plaintiffs and the Heat Transfer entities have settled and dismissed most of the lawsuits, despite API's absence.  If failing to name API were

---

[4] *See* Case No. 19-C-291 (Kanawha Cnty., W. Va.) ($5,000.00 settlement); Case No. 18-C-492 (Kanawha Cnty., W. Va.) ($17,500.00 settlement); Case No. 09-L-007784 (Cook Cnty., Ill.) ($15,000.00 settlement).

a "mistake"—rather than a tactical choice made by hundreds of experienced and sophisticated product-liability plaintiffs' attorneys—it is unthinkable that it would have remained uncorrected to date. This case is thus entirely unlike *Fitzpatrick*, where any "inaccuracies in the plaintiff's pleadings [were] likely to become apparent when the true facts [were] developed on the record and the role of the insured in the incident [were] fully exposed." 78 N.Y.2d at 69. Every fact relevant to API's potential liability has long been known to plaintiffs and their counsel, yet they have remained content to litigate and resolve the Asbestos Lawsuits without bringing API into the fray.

A better analogue to this case than *Fitzpatrick* is *Columbus McKinnon*, where the claimants "may well have intended to bring suit" against entities other than the insured and "the underlying claimants' decisions as to whom to sue may have been deliberate." 367 F. Supp. 3d at 150-51. Because the facts did not support an inference that the insured was omitted by "mistake," the court held that *Fitzpatrick* was inapplicable. *Id.* The same is true here.

Further, even assuming sophisticated counsel all made the same "mistake" in failing to name or add API as a defendant in the 700+ Asbestos Lawsuits, API adduced no evidence establishing that the Insurers had "actual knowledge" of any such mistake, as *Fitzpatrick* requires. 78 N.Y.2d. at 67. The court in *Fitzpatrick* emphasized that it was not imposing on insurers a "duty to investigate"—a duty to

33

defend arises only from "facts *known* to the insurer." 78 N.Y.2d at 67 n.2. As just shown, there are no facts suggesting that any "mistake" was made in the first instance, but even if so, there is no evidence the Insurers knew that hundreds of plaintiffs and their counsel made a mistake, rather than a tactical decision to focus on the Heat Transfer entities themselves.

For these reasons, even accepting the district court's flawed construction of *Fitzpatrick*, summary judgment for the Insurers is still required.

### C. There Is No Need To Certify Any Question About The Plain Meaning Of The Policy Language

In its order granting the parties' 28 U.S.C. § 1292(b) petitions, this Court directed the parties to address "whether any of the issues raised in these appeals should be certified to the New York Court of Appeals." JA1434. This Court generally considers certification appropriate only "if the New York Court of Appeals has not squarely addressed an issue and other decisions by New York courts are insufficient to predict how the Court of Appeals would resolve it" and "if the questions certified will control the outcome of the case." *Penguin Grp. (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 42 (2d Cir. 2010).

The Insurers submit that there is no need to certify to the New York Court of Appeals any question about whether the plain policy language covering suits "against the insured" is triggered by a suit that is *not* "against the insured." As shown, the question essentially answers itself, as multiple New York decisions

34

confirm. The policy language and existing precedent are more than sufficient to predict how the Court of Appeals would resolve the first issue.

Even under the district court's analysis, API's alleged coverage arises not from the plain policy language, but from an unprecedented extension of the New York Court of Appeals' decision in *Fitzpatrick* to the fundamentally different facts of this case. But for the reasons set forth above, there is no reason whatsoever to predict that the Court of Appeals would construe *Fitzpatrick* as overriding the plain policy language and triggering a duty to defend even absent any suit against the insured. The Court should consider certifying a question on this issue only if it disagrees and considers such a prediction plausible—that is, this Court should not give its imprimatur to API's reading of *Fitzpatrick* without seeking input from the New York Court of Appeals.

## II. THE POLICY LANGUAGE COMPELS PRO RATA ALLOCATION OF DEFENSE COSTS WITH ALLOCATION TO API FOR UNCOVERED PERIODS

Because, for the reasons stated above, coverage is categorically foreclosed in this case given the absence of any suit against the insured, this Court should have no occasion to address the allocation issues. If, however, the Court does find coverage and thus must consider allocation, it should reverse the district court's determination that defense costs in this case are subject to "all sums" allocation

without contribution from API for injuries occurring during the lengthy periods for which it lacks coverage.

As discussed *supra* at 12-13, the district court correctly held that *indemnity* costs are to be allocated on a pro rata basis, including to the insured for uncovered periods. That conclusion is compelled by the well-established New York rule that where, as here, an insurance policy contains language providing coverage only for bodily injury or property damage that takes place "during the policy period," long-tail losses that occur over successive policy periods must be allocated on a pro rata basis, typically based on the proportion of time "on the risk" represented by each insurer's period. *See Con Ed*, 98 N.Y.2d at 224 (explaining that "during the policy period" language provides "for liability incurred as a result of an accident or occurrence during the policy period, not outside that period," and that "[p]roration of liability . . . acknowledges the fact that there is uncertainty as to what actually transpired during any particular policy period"); *accord Keyspan*, 31 N.Y.3d at 58; *Roman Cath. Diocese of Brooklyn v. Nat'l Union Fire Ins. Co.*, 21 N.Y.3d 139, 154-55 (2013). As *Keyspan* further establishes—and as the district court recognized—the appropriate pro rata allocation of indemnity costs in these circumstances also requires allocation to the insured for periods in which there are gaps in coverage "regardless of whether the lack of insurance coverage was attributable to a voluntary decision to self-insure or to an inability to obtain

coverage." *Keyspan*, 31 N.Y.3d at 60.  Allocation to the insured is required,

*Keyspan* explains, because "the contract language that provides the foundation for

the pro rata approach—namely, the 'during the policy period' limitation"—

prohibits "allocat[ing] risk to the insurer for years outside the policy period." *Id*. at

61.[5]

Where the district court went wrong was in departing from these settled

principles for the allocation of *defense costs*, thereby creating a hybrid allocation

scheme for this case:  pro rata allocation (with allocation to API) with respect to

indemnity, but all sums allocation (without contribution from API) for purposes of

defense costs.  That hodgepodge approach cannot be squared with the language of

the Policies and abundant precedent holding that where, as here, defense costs can

be readily allocated on a pro rata basis, that method of allocation (including

allocation to the insured) is legally required.  Indeed, on the facts here, even if

_____

[5] While the New York Court of Appeals in *Viking Pump* carved out an exception to this principle for policies that contain "non-cumulation" clauses that extend a policy's coverage to losses occurring outside its policy period, *see* 27 N.Y.3d at 261, the district court correctly determined that *Viking Pump* has no application here because the policies do not contain such clauses or their equivalent.  As will be discussed in response to API's cross-appeal, the district court correctly rejected API's effort to stretch the holding of *Viking Pump* to encompass the Policies here on the basis of policy language defining bodily injury to include "death at any time" stemming from that bodily injury.  *See* SPA41.

allocation is a matter of discretion, it would be an abuse of such discretion to mandate any approach other than pro rata.

> **A.    Policy Language And Precedent Dictate That When Defense Costs *Can* Be Allocated On A Pro Rata Basis With Allocation To The Insured, They *Must* Be Allocated On That Basis**

The district court's determination that, when it came to defense costs, it could depart from the allocation methodology it had deemed applicable to indemnity costs ignores key policy language linking the duty to defend to the duty to indemnify.  As that policy language and case law makes clear, defense cost allocation in this case must follow the indemnity allocation:  pro rata among the insurers and API itself (for uncovered periods).

> 1.    The Language Of The Policies Requires Pro Rata Allocation of Defense Costs With Allocation To API For Uncovered Periods

As set forth *supra* at 8, the Policies all contain the key language that *Con Ed* construed to require pro rata allocation: they limit coverage to bodily injury "during the policy period."  The Policies further specify that they will pay damages only "to which this insurance applies" and that they will defend only those suits seeking damages "to which this insurance applies."  *See supra* at 8-10.  This policy language is dispositive not only of indemnity allocation, but also of defense cost allocation.

As one court observed, the key phrase "'to which this insurance applies' plainly limits the scope of *both* the defendants' indemnification and defense

obligations to bodily injury caused by an occurrence during the applicable policy periods." *Nat'l Hockey League v. TIG Ins. Co.*, 76 Misc. 3d 427, 434 (N.Y. Sup. Ct., N.Y. Cnty. 2022) ("*NHL*") (emphasis added). Notably, the phrase does not state merely that the insurance's *indemnification obligations* apply solely to bodily injury occurring during the policy period—the provision more broadly states that "this insurance" is limited by the "during the policy period" restriction. And "this insurance" includes *both* indemnification and defense duties. The phrase thus connects the defense duty and the indemnification duty and confirms that both defense and indemnity obligations are limited by the "during the policy period" qualifier. In short, "the policy's coverage is limited only to injury that occurs within the finite … coverage period of the policy," *Roman Catholic*, 21 N.Y.3d at 154, and that limitation of "coverage" is as equally applicable to defense costs as it is to indemnity.

The same policy language dictates that where, as here, long-tail injuries occurred over a period of time that included gaps in coverage, defense costs must be allocated to the insured for uncovered periods. As the New York Court of Appeals has explained, the Policies' "during the policy period" limitation prohibits "allocat[ing] risk to the insurer for years outside the policy period." *Keyspan*, 31 N.Y.3d at 61. *Keyspan*'s reasoning applies equally to defense cost allocation because "the premiums received by an insurer for policies issued by it include

compensation for the risk of having to defend a claim on that policy as well as the risk of having to pay the claim." *Nat'l Grange Mut. Ins. Co. v. Cont'l Cas. Ins. Co.*, Slip Op. No. 85-5783, at 2 (S.D.N.Y. Feb. 11, 1987), *reprinted in* Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* § 6.02(a)(1) (21st ed. 2022). Affording defense coverage to insureds for periods in which they paid no premiums to their insurers would thus impermissibly "provide insurance coverage to policyholders for years in which no premiums were paid" and enable an insured to "receive coverage without regard to the number of years for which it purchased applicable insurance"—an outcome that the New York Court of Appeals has expressly rejected. *Keyspan*, 31 N.Y.3d at 61.

The Court of Appeals previewed that conclusion in *Rapid-American*, where it indicated that "pro rata sharing of defense costs may be ordered," while noting that no "error or unfairness" arises if such sharing is not ordered immediately, so long as the record shows that adequate contribution will be possible. 80 N.Y.2d at 655. As to contribution from the insured itself, the Court "deferred" ruling on the issue because disputed factual issues existed as to whether there were occurrences during uncovered periods and whether any uncovered periods even existed at all. *Id.* at 656. No such disputes exist here: the uncontradicted evidence shows both that API was uninsured for many years and that underlying injuries occurred during those uncovered periods. The record thus fully supports immediate pro rata

allocation of defense costs—including allocation to API for uncovered periods—as required by the policy language.

2.  Ample Precedent In New York And Elsewhere Supports Pro Rata Allocation Of Defense Costs

In accordance with this policy language, New York federal and state courts have routinely found pro rata allocation of defense costs appropriate in cases like this one.  In *Travelers Indemnity Co. v. Northrop Grumman Corp.*, 2013 WL 12325152 (S.D.N.Y. Nov. 4, 2013), for example, the court adopted pro rata allocation of defense costs in an environmental coverage case, reasoning that "it makes little sense to require a party to cover defense costs relating to coverage periods for which it cannot have any obligation," *id.* at *3.  The court illustrated the impropriety of all sums allocation with a hypothetical:  "There can be no doubt that if separate actions were brought as to the separate periods, [the insurer] would have no duty to defend those actions for periods as to which it had not provided coverage."  *Id.*  Accordingly, "[t]aken to its logical conclusion," allowing all sums allocation "would allow a party to incur potentially millions of dollars of defense costs when within the four corners of a complaint it simply could not—as pled—be responsible for all of the discovery costs and motion practice involved in litigating those other periods."  *Id.*; *see also Columbus McKinnon*, 367 F. Supp. 3d at 148-49 (allocating defense costs on pro rata basis is appropriate when it is "viable"); *Fulton Boiler Works, Inc. v. Am. Motorists Ins. Co.*, 2010 WL 1257943, at *8 &

41

n.7 (N.D.N.Y. Mar. 25, 2010) (adopting pro rata allocation "for the reasons stated in" insurers' briefing, which urged same allocation rule for indemnity and defense costs[6]); *Avondale Indus., Inc. v. Travelers Indem. Co*., 774 F. Supp. 1416, 1437 (S.D.N.Y. 1991) (holding that allocation of defense costs should adopt same pro rata allocation as indemnity).

Numerous New York state court decisions agree that "the allocation of defense and settlement costs should be on a pro rata basis" in order to give effect to the "during the policy period" requirement. *Nat'l Union Fire Ins. Co. of Pittsburgh v. Roman Cath. Diocese of Brooklyn*, 2017 WL 748834, at *5 (N.Y. Sup. Ct., N.Y. Cnty. 2017); *see Atl. Mut. Ins. Co. v. Greater N.Y. Mut. Ins. Co.*, 241 A.D.2d 427, 427 (1st Dep't 1997) (calling for "pro rata shar[ing] of defense costs" among insurers); *Mt. McKinley Ins. Co. v. Corning Inc,*, 2012 N.Y. Misc. LEXIS 6531, at *59 (N.Y. Sup. Ct., N.Y. Cnty. Sept. 7, 2012) (rejecting joint and several allocation of defense costs in asbestos coverage case and holding that "pro rata allocation" of defense costs was "appropriate" in a case "involving successive policies covering the same risk, with self-insurance and an insolvent insurer

---

[6] *See* Brief in Opposition, *Fulton Boiler Works v. Am. Motorists Ins. Co. et al*, No. 5:06-cv-1117 (N.D.N.Y. June 30, 2009) (ECF No. 125-2) at 2 (arguing that court "should not apply different allocation approaches to defense and indemnity"); Brief in Opposition, *Fulton Boiler Works v. Am. Motorists Ins. Co. et al*, No. 5:06-cv-1117 (N.D.N.Y. June 30, 2009) (ECF No. 126) (same); *see also Fulton Boiler Works*, 2010 WL 1257943, at *8 n.7.

present during the relevant time periods"); *Travelers Indem. Co. v. Fischbach, LLC, Ex-Fm, Inc.*, 2011 WL 1495196 (N.Y. Sup. Ct., N.Y. Cnty. 2011) (ordering "pro rata allocation of liability and defense costs among the successive policies" in light of policy language "limit[ing] liability to bodily injuries that occur during the policy period").

Many New York cases have also recognized the essential corollary to the requirement of pro rata allocation of defense costs: the insured itself must bear its pro rata share of defense costs for claims attributable to periods not covered by insurance. Thus, for example, the *NHL* court deemed "allocation of defense costs to NHL for the periods that it was self-insured" to be warranted in light of the policy language that "agreed to cover the defense for only suits alleging bodily injury that occurred during the policy periods." 76 Misc. at 433, 435. Because "each of the policies [was] limited to the amount of time that it covered," defense costs had to be "allocated among the insurers and the insured (for its self-insured periods) commensurate with their proportionate time on the risk." *Id.* at 435. Along the same lines, the court in *Danaher Corp. v. Travelers Indemnity Co.*, 414 F. Supp. 3d 436 (S.D.N.Y. 2019), held that "the principle from *Keyspan Gas* that an insured must bear the risk of loss allocable to any years in which the insured went without coverage" applied equally to defense costs, observing that there was

"no compelling basis for excusing [insureds]" from their obligation to pay their "fair share" of defense costs, *id.* at 454.

These decisions recognize that an insured should "pay its fair share for the defense of the non-covered risk" where "defense costs can be readily apportioned." *Generali-U.S. Branch v. Caribe Realty Corp*., 1994 WL 903279, at *2 (N.Y. Sup. Ct., N.Y. Cnty. Dec. 5, 1994). To hold otherwise, courts have explained, would allow an insured to "obtain insurance for one year, and be uninsured for fifty years before and after that year," then require an insurer to defend the entire action without the ability to "obtain contribution for defense costs from the insured" in the event of an underlying suit alleging occurrences "falling within and without that one year of coverage." *NL Indus., Inc. v. Com. Union Ins. Co*., 935 F. Supp. 513, 521 (D.N.J. 1996) (New York law); *see also id.* (rejecting the notion that "the indivisible nature of the duty to defend . . . applies to periods of self-insurance"). Put otherwise, "[s]elf-insurance is called 'going bare' for a reason": an insured "that fails to purchase insurance for a period … is self-insuring for all the risk incurred in that period; otherwise it would be receiving coverage for a period for which it paid no premium." *Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368,

1392 (E.D.N.Y. 1988) (adopting pro rata allocation for defense and indemnity and requiring insureds to contribute for uncovered periods).[7]

Courts across the country share New York's approach to defense cost allocation. In the seminal case *Insurance Co. of North America v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980), for instance, the Sixth Circuit recognized the foundational principle that "[a]n insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period," *id.* at 1224-25. Accordingly, "neither logic nor precedent"

─────────────

[7] *See also Mt. McKinley*, 2012 N.Y. Misc. LEXIS 6531, at *59 (contemplating contribution from insured through pro rata allocation of defense costs and rejecting joint and several allocation in part because it would "forc[e]" the insurer "to litigate with [the insured] as to [the insured's] own liability for defense costs" for self-insured periods); *Columbus McKinnon*, 367 F. Supp. 3d at 148-49 & n.14 (leaving open possibility of "potential later contributions" for policyholder for periods of self-insurance based on insured's "obligation to contribute, retroactively, to defense costs, based on the period of self-insurance relevant to the resolved claims"); *Fulton Boiler*, 2010 WL 1257943, at *7-8 (endorsing contribution by insured where "evidence in a particular case establishes that the 'alleged occurrence' occurred, in full or in part, during an uninsured period," though the requisite evidence was lacking in that particular case); *cf. N. River Ins. Co. v. Duro Dyne Nat'l Corp.*, 153 A.D.3d 844, 847 (2d Dep't 2017) ("The court appropriately deferred the issue of whether the [insureds] must contribute to their defense costs for uninsured periods at least until such time as the underlying lawsuits are shown to involve 'occurrences' during the period when they lacked insurance.").

support allowing a "manufacturer which ha[s] insurance coverage for only one year out of 20" to be "entitled to a complete defense of all asbestos actions the same as a manufacturer which ha[s] coverage for 20 years out of 20." *Id.* at 1225. The court further recognized that "the insured must pay its fair share for the defense of the non-covered risk" where a "distinction" could be "readily made" between claims arising from occurrences during the non-covered period and those arising during a covered period. *Id.* Because the same "reasonable means of proration" that was applicable to indemnity costs equally "app[lied] to defense costs," and it was "reasonable to treat [the insured] as an insurer for those periods of time that it had no insurance coverage," pro rata allocation with contribution from the insured was required. *Id.* The principles articulated in *Forty-Eight Insulations* underly the New York decisions set forth above, *see, e.g.*, *Danaher*, 414 F. Supp. 3d at 454 (expressly adopting reasoning of *Forty-Eight Insulations*), and are endorsed in other jurisdictions as well. *See, e.g.*, *Towns v. N. Sec. Ins. Co.*, 964 A.2d 1150, 1167 (2008); *Sec. Ins. Co. of Hartford v. Lumbermens Mut. Cas. Co.*, 826 A.2d 107, 121 (Conn. 2003); *Owens-Illinois, Inc. v. United Ins. Co.*, 650 A.2d 974, 995 (N.J. 1994); *Gulf Chem. & Metallurgical Corp. v. Assoc. Metals & Mins. Corp.*, 1 F.3d 365, 372 (5th Cir. 1993).

As the foregoing discussion demonstrates, "the weight of authority" holds that when the facts show "the insured is self-insured for part of the coverage

46

period," then "the insured must bear a pro rata share of defense costs." Ostrager &

Newman, *supra*, § 6.02(a)(2); *see* Scott M. Seaman & Jason R. Schulze, *Allocation*

*of Losses in Complex Insurance Coverage Claims* App'x A (50 State Survey of

Allocation Decisions) (2024) (collecting cases from across country holding that

defense costs should be allocated pro rata and requiring contribution from insured

for uncovered periods). Especially given the overwhelming endorsement of that

rule among New York state and federal courts, not to mention the logic and

fairness underlying the rule, there is no basis for predicting that the Court of

Appeals would reach a contrary result.

**B.** **Even If Defense-Cost Allocation Were Discretionary, Failing To Order Pro Rata Allocation With Allocation To API Would Be An Abuse Of Discretion On This Record**

The district court held that defense costs are "required" to be allocated on a

joint-and-several basis as a matter of law. SPA43. For the reasons discussed in the

prior section, that holding is wrong as a matter of law—in fact, on this record, the

policy language dictates that defense costs be allocated pro rata, with API bearing

its own pro rata share. *See supra* Part II.A. Even if the policy language leaves the

district court discretion, the same result obtains: given the absence of any practical

obstacles to pro rata allocation, it would be demonstrably unfair—and hence an

abuse of discretion—to mandate any other allocation approach.

It is undisputed that there are many missing and insolvent policies throughout API's coverage profile, leaving API without payable insurance for multiple periods before, after, and among the periods covered by the Policies. The Asbestos Lawsuits, meanwhile, allege injuries occurring over extended time periods. As the Insurer's Policies were in effect for only a small fraction of those periods, API lacks insurance coverage for the majority of the periods implicated by the lawsuits. In these circumstances, forcing any one insurer to bear the entirety of defense costs without the prospect of adequate contribution from API for its own lengthy uncovered years would work the precise "unfairness" that *Rapid-American* warned against. 80 N.Y.2d at 655-56.

As noted *supra* at 7-8, the Policies collectively span a period of only eleven years and three months, whereas the underlying asbestos liabilities relate to injury taking place over several decades. The broad gaps in coverage stem both from API having lost certain of its policies and from the insolvency of several of its insurers—neither of which are circumstances for which the Insurers could fairly be made to bear the cost. API's inability to find its own policies is entirely API's responsibility. Similarly, it is appropriate for the risk of insurer insolvency to fall on the insured, who selected "the defaulting insurer's policy, rather than on another insurer which was a stranger to the selection process." *Olin Corp. v. Ins. Co. of N. Am.*, 221 F.3d 307, 323 (2d Cir. 2000). Even setting aside that the policy language

requires pro rata allocation here as explained *supra* Part II.A, the principle of

"fairness" recognized in *Rapid-American* mandates the same result. *See*, *e.g.*,

*Consol. Edison Co. of N.Y. v. Fyn Paint & Lacquer Co.*, 2005 WL 139170, at *5

(E.D.N.Y. Jan. 24, 2005) (apportioning defense costs pro rata where insurer would

be unable to adequately recoup costs through contribution and would accordingly

be "burdened with more than its share of the costs").

## C. The District Court's Rationale For Adopting All Sums Allocation Is Meritless

The district court's decision to depart from the principles set forth above and

order all sums allocation of defense costs without contribution from API rested

almost entirely on *Rapid-American*, which the court construed as making all sums

allocation "required in this case." SPA42-43 (citing *Rapid-American*, 80 N.Y.2d.

at 655). As already explained, however, *Rapid-American* did *not* mandate all sums

allocation for all cases; indeed, it did not even mandate all sums allocation *in that

case*. To the contrary, the Court of Appeals emphasized a court's power to order

pro rata allocation, but it deferred ruling on pro rata allocation to the insured in that

case only because disputed factual issues existed as to whether there were any

uncovered periods for which allocation to the insured would apply. In other words,

the Court of Appeals merely held that pro rata allocation should not be ordered

when the relevant facts as to the existence of injuries during uncovered periods did

not yet support that approach. And later-decided cases such as *Con Ed*, *Roman*

*Catholic*, and *Keyspan* have confirmed that under the policy language that controls here, pro rata allocation *is* required when the facts support it, as they do in this case.  *See supra* at 39-40.

The district court also embraced an additional argument advanced by API, which asserted that all sums allocation is compelled by the insurer's broad contractual duty to provide a full defense of the entire underlying lawsuit, and that this asserted contractual obligation overrides any countervailing considerations that supposedly sound only in equity.  *See* SPA42-43.  That contention lacks merit.

By relying on the "defense of the entire action" obligation as a supposed basis for all sums allocation, the district court and API conflate the *provision of a defense* with the *apportionment of costs in connection with that defense duty*.  As the Fifth Circuit explained in *Gulf Chemical*, "apportioning the cost of an insured's defense among those liable for exposure risk during the period for which claims are made against the insured" in no way "limit[s] the duty of defending the insured." 1 F.3d at 372 (emphasis omitted).  An "incomplete defense" would be a defense in which an insurer attempted to selectively fund only those portions of the litigation shown to relate specifically to its policy period.  Pro rata allocation of defense costs does nothing of the sort—it simply requires each party "on the risk" (including the insured itself) to make a pro rata contribution to the overall cost of defense.  Many jurisdictions have mandated pro rata allocation of defense costs

50

and required the insured to bear its share of costs allocable to uncovered periods, and API has cited no authorities or data from those jurisdictions showing that the rule undermines fulfillment of the defense duty. *See supra* at 45-46. To the contrary, the insured's entitlement to a defense is entirely consistent with contractual terms requiring that the *costs* of that defense be divided among all parties on the risk during the period of injury—including the insured where appropriate—in accordance with their pro rata share of the risk.

### D. A Question Should Be Certified On The Defense Cost Allocation Issue Only If A Question Is Certified On The Named Insured Issue

The Insurers submit that certification is unnecessary here given the obvious threshold failure of API's coverage claims. *See supra* Part I.C. Because no credible reading of API's policy language allows for coverage where, as here, there is no suit against any insured entity, the Court has no need to reach the more certification-worthy defense-cost allocation issue presented in this appeal.

But if the Court does certify the threshold coverage question, certification of the defense-cost allocation question may be appropriate. As noted above, key considerations for certification are whether the New York Court of Appeals has "squarely addressed an issue" and whether "other decisions by New York courts are []sufficient to predict how the Court of Appeals would resolve it." *Penguin Group*, 609 F.3d at 42. As shown in this section, the New York Court of Appeals

51

has not conclusively resolved the defense-costs allocation issue, but other New York decisions are amply sufficient to predict that the Court of Appeals would follow the weight of authority in New York and elsewhere to require that defense costs be allocated pro rata where, as here, indemnity costs are allocated pro rata. But if the New York decisions do not provide this Court enough confidence to make that prediction, they *certainly* do not justify the contrary prediction. The Court accordingly should certify a question about defense-cost allocation only if the Court deems it plausible that the Court of Appeals could both find coverage absent a suit against the insured and mandate all sums allocation of defense costs.

## CONCLUSION

For the foregoing reasons, this Court should reverse the decision below and order summary judgment to the Insurers on the basis that coverage is foreclosed because API is not a defendant in the Asbestos Lawsuits. In the alternative, this Court should reverse the decision below to the extent it ordered "all sums" allocation of defense costs and remand for entry of partial summary judgment in favor of the Insurers making clear that defense costs, like indemnity costs, should be allocated on a pro rata basis with allocation to API for uncovered periods.

Respectfully submitted,

Michael A. Kotula
RIVKIN RADLER LLP
926 RXR Plaza, West Tower
Uniondale, N.Y. 11556
(516) 357-3000

Steven C. Schwartz
CHAFFETZ LINDSEY LLP
1700 Broadway, 33rd Fl.
New York, N.Y. 10019
 (212) 257-6960

*Attorneys for Fireman's Fund
Insurance Company*

Meg F. Catalano
Christina R. Salem
KENNEDYS LLP
120 Mountain View Boulevard
Basking Ridge, N.J. 07920
(908) 848-1222

*Attorneys for The North River
Insurance Company*

/s/ Jonathan D. Hacker

Jonathan D. Hacker
Jenya Godina
O'MELVENY & MYERS LLP
1625 Eye Street, N.W.
Washington, D.C. 20006
(202) 383-5300

Frank B. Slepicka
COHN BAUGHMAN
525 West Monroe St., Suite 1500
Chicago, IL 60661
(312) 753-6639

*Attorneys for Federal Insurance
Company*

53

## CERTIFICATE OF COMPLIANCE

1.  This brief complies with the type-volume limitations of Second Circuit Rule 32.1 because this brief contains 12,625 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

 Dated:  August 2, 2024                    Respectfully submitted,


                                         */s/ Jonathan D. Hacker*
                                         JONATHAN D. HACKER
                                         O'MELVENY & MYERS LLP
                                         1625 Eye Street, N.W.
                                         Washington, D.C. 20006
                                         (202) 383-5300

54

## CERTIFICATE OF SERVICE

I hereby certify that on this 2nd day of August, 2024, I electronically filed the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Second Circuit by using the appellate CM/ECF system. All participants are registered CM/ECF users, and will be served by the appellate CM/ECF system.

Dated: August 2, 2024                    Respectfully submitted,

                                         /s/ Jonathan D. Hacker
                                         JONATHAN D. HACKER
                                         O'MELVENY & MYERS LLP
                                         1625 Eye Street, N.W.
                                         Washington, D.C. 20006
                                         (202) 383-5300

**SPECIAL APPENDIX**

i

## TABLE OF CONTENTS

**Page**

Report, Recommendation, and Order of the
   Honorable H. Kenneth Schroeder, Jr., dated
   August 4, 2021........................................................ SPA-1

Decision and Order of the Honorable Richard J.
   Arcara, dated December 21, 2022 ........................ SPA-31

Decision and Order of the Honorable Richard J.
   Arcara, dated November 20, 2023 ........................ SPA-47

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**AMERICAN PRECISION INDUSTRIES, INC.,**

                                **Plaintiff,**

**v.**

                                                **14-CV-1050-RJA-HKS**

**FEDERAL INSURANCE COMPANY,**
**FIREMAN'S FUND INSURANCE COMPANY, and**
**AND NORTH RIVER INSURANCE COMPANY,**

                                **Defendants.**

───────────────────────────────────

### REPORT, RECOMMENDATION, AND ORDER

        American Precision Industries, Inc. ("API") commenced this action on

December 16, 2014, seeking a declaration that Federal Insurance Company ("Federal"),

Fireman's Fund Insurance ("Fireman's Fund"), and North River Insurance Company ("North

River") (collectively "the Insurers"), must defend and indemnify API in connection with

hundreds of third-party asbestos claims arising from exposure to products manufactured

and/or sold by API.  Dkt. No. 1, ¶¶ 14, 15.  The case was thereafter referred to the

undersigned by the Hon. Richard J. Arcara, in accordance with 28 U.S.C. § 636(b)(1)(A), for

all pretrial matters.  Dkt. No. 8.  Currently before the Court are API's Motion for Summary

Judgment (Dkt. No. 87); the Insurers' Joint Motion for Partial Summary Judgment on

Allocation and Voluntary Payments (Dkt. No. 89); the Insurers' Joint Motion for Summary

Judgment on the (1) Named Insured, (2) Standing, and (3) Contractual Indemnity Issues

(Dkt. No. 90); the Insurers' Joint Motion for Summary Judgment on Statute of Limitations

(Dkt. No. 91); API's Cross-Motion for Summary Judgment (Dkt. No. 96); and the Insurers'

Motion to Strike API's Reply Brief in Support of its Cross-Motion for Summary Judgment

(Dkt. No. 109).

1

SPA-2

## FACTS

The following facts are taken from the parties' Statements of Undisputed Facts and the Responses and Replies thereto.  Dkt. Nos. 89-1, 90-1, 91-1, 92, 94-3, 95-1, 98, 100-2, 105.

Corporate History

API incorporated under New York law in 1947 and operated as a manufacturer of industrial equipment including heat transfer products.  Dkt. No. 105, ¶ 19.  During the ensuing decades, API acquired other companies and formed numerous divisions and "brands," which were made part of API's Heat Transfer Group.  Dkt. No. 105, ¶ 20.  These "brands" were not separate corporate entities, but rather, existed as part of API.  Dkt. No. 105, ¶ 21.  For example, API acquired Basco Inc. in 1962, a manufacturer of shell and tube heat exchangers,[1] and thereafter operated Basco as a division of API.  Dkt. No. 94-3, ¶ 7; Dkt. No. 105, ¶ 22.

In 1996, API formed three subsidiary companies, API AirTech, Inc. ("AirTech"), API Basco, Inc. ("Basco"), and API Heat Transfer, Inc. ("Heat Transfer").  Dkt. No. 105, ¶ 23.  API conveyed assets, but no liabilities to AirTech, Basco, and Heat Transfer, and thereafter sold these entities to a third party through a series of corporate transactions.  Dkt. No. 105, ¶ 24.  At present, API is an inactive subsidiary of its parent, Danaher Corporation ("Danaher"), and has no employees.  Dkt. No. 94-3, ¶¶ 14, 15.

---

[1] Basco's products had component parts containing asbestos.  Dkt. No. 94-3, ¶ 7.

2

Asbestos Lawsuits

Since 2002, more than 700 lawsuits have been filed by third parties alleging bodily injuries resulting from exposure to asbestos contained in products manufactured and/or sold by API.  Dkt. No. 105, ¶ 25.  As of October 23, 2017, at least 769 such lawsuits have been brought.  Dkt. No. 105, ¶ 26; Dkt. No. 89-17.  In all of these cases, the alleged exposure to asbestos occurred prior to 1996, before Heat Transfer, Basco, and Airtech were formed.  Dkt. No. 105, ¶¶ 28, 29.  API seeks coverage for all past suits, and all future lawsuits as well ("the Underlying Lawsuits").  Dkt. No. 105, ¶ 28.

Insurance Policies

API alleges that at various times, the Insurers were obligated to defend and indemnify it in connection with the Underlying Lawsuits under the primary policies sold to API during the relevant time frame ("Primary Policies").  The Primary Policies include:  a three-year primary policy issued by North River covering the period from December 31, 1974 through December 31, 1977 (Dkt. No. 105, ¶ 1);  three primary policies issued by Fireman's Fund covering the period from December 31, 1987 through April 1, 1989 (Dkt. No. 105, ¶ 2); and five consecutive primary policies issued by Federal covering the period from April 1, 1992 through April 1, 1997.  Dkt. No. 105, ¶ 3.

Each of the Primary Policies obligate the insurer to defend and provide that defense costs are paid in addition to (i.e., do not erode) the policy limits.  Dkt. No. 105, ¶ 4. None of the Primary Policies contain an asbestos exclusion.  Dkt. No. 105, ¶ 5.  The North River Policy states "the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage [to which

3

this insurance applies], even if any of the allegations of the suit are groundless, false or fraudulent ….”  Dkt. No. 105, ¶ 6 (citing Dkt. No. 89-15, p. 5).  The 1985-87 and 1987-88 Fireman’s Fund Policies contain identical language.  Dkt. No. 105, ¶ 7 (citing Dkt. No. 89-42, p. 10; Dkt. No. 89-43, p. 8; Dkt. No. 89-44, p. 8).  The 1988-89 Fireman’s Fund Policy states, “We will have the right and duty to defend any suit seeking those damages [bodily injury or property damage to which this insurance applies] even if the allegations of the suit are groundless, false or fraudulent.”  Dkt. No. 105, ¶ 8 (citing Dkt. No. 89-44, p. 16).  The 1992-93, 1993-94, 1994-95, and 1995-96 Federal Policies contain provisions requiring Federal to “defend any claim or suit against the insured[,]” Dkt. No. 105, ¶ 12, whereas the 1996-97 Federal Policy states that Federal “will have the right and duty to defend any Insured against a suit seeking damages for bodily injury.”  Dkt. No. 105, ¶ 13.


The North River Policy and the 1985-87 and 1987-88 Fireman’s Fund Policies each provides that “[t]he Company will pay, in addition to the applicable limit of liability: (a) all expenses incurred by the Company, all costs taxed against the insured in any suit defended by the Company ….”  Dkt. No. 105, ¶ 8 (citing Dkt. No. 89-15, p. 7); Dkt. No. 105, ¶ 10 (citing Dkt. No. 89-42, p. 17; Dkt. No. 89-43, p. 15).  The 1988-89 Fireman’s Fund Policy states, “[w]e will pay, with respect to any claim or ‘suit’ we defend: 1. All expenses we incur …. 5. All costs taxed against the insured in the ‘suit’ ….”  Dkt. No. 105, ¶ 11 (citing Dkt. No. 89-44, p. 11).  The 1992-93, 1993-94, 1994-95, and 1995-96 Federal Policies require Federal to “defend any claim or suit against the insured” and to pay “defense expenses,” which are defined to include “attorney fees and all other litigation expenses” and “reasonable expenses incurred by the insured at our request to assist us in the investigation or defense of the claim or suit.”  Dkt. No. 105, ¶ 12 (citing Dkt. No. 89-13, pp. 16, 35-36, 71,

4

90-91, 135, 154-55, 204, 223-24).  The 1996-97 Federal Policy states that Federal "will have the right and duty to defend any Insured against a suit seeking damages for bodily injury" and that with respect to a suit against an Insured that Federal defends, Federal will pay "all expenses we incur," including "reasonable expenses incurred by the Insured at our request to assist us in the investigation or defense of the claim or suit" and "costs taxed against the insured in the suit."  Dkt. No. 105, ¶ 13 (citing Dkt. No. 89-13, p. 300).

The North River Policy and the 1985-87 and 1987-88 Fireman's Fund Policies define "bodily injury" as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom."  Dkt. No. 105, ¶ 14 (citing Dkt. No. 89-15, p. 7); Dkt. No. 105, ¶ 15 (citing Dkt. 89-42, p. 15); Dkt. 89-43, p. 13).  The 1988-89 Fireman's Fund Policy defines 'bodily injury' as follows: "'Bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."  Dkt. No. 105, ¶ 16 (citing Dkt. No. 89-44, p. 13). The 1992-93, 1993-94, 1994-95, and 1995-96 Federal Policies contain the following definition of "bodily injury": "'Bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time."  Dkt. No. 105, ¶ 17 (citing Dkt. No. 89-13, pp. 35, 90, 154, 223).  The 1996-97 Federal Policy states that "[b]odily injury means physical: injury, sickness, or disease sustained by a person and, if arising out of the foregoing, mental anguish, mental injury, shock, humiliation or death at any time."  Dkt. No. 105, ¶ 18 (citing Dkt. 89-13, p. 311).

## DISCUSSION AND ANALYSIS

<u>Standing</u>

A party invoking federal jurisdiction must establish the three elements of standing:  an "injury in fact," a causal connection between the injury and the conduct complained of, and a likelihood that the injury will be "redressed by a favorable decision." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).  The Insurers contend that API cannot demonstrate that it has suffered an "injury in fact," because Danaher, API's parent company, has heretofore paid the fees and costs in defending the Underlying Lawsuits.  Because API has not "incurred fees and costs" in connection with the claims, the Insurers argue, "it has no standing to maintain this action under Article III of the U.S. Constitution."  Dkt. No. 90-45, p. 20.  This Court does not agree.

An "injury in fact" requires "an invasion of a legally protected interest" that is both "concrete and particularized," as well as "actual or imminent" rather than "conjectural or hypothetical."  *Lujan*, 504 U.S. at 560.  This Court finds that API has met all of the "injury in fact" requirements to invoke federal jurisdiction.  Dkt. No. 94, p. 24.  First, the Insurers have refused to fund the defense of past and future asbestos lawsuits brought against API's former subsidiaries.  This constitutes "an invasion of a legally protected interest," namely, API's right to a defense under the Primary Policies.  The dispute between API and the Insurers is "concrete," "particularized," "actual," and "imminent" because API insists that the Insurers are obligated to defend and indemnify it in the Underlying Suits under the Primary Policies, and the Insurers maintain that they are not so obligated.

SPA-7

The Insurers' argument that API has not suffered an "injury in fact" because API's corporate parent paid to defend the Underlying Lawsuits is not borne out by the record. Although API's corporate representative, Dr. Timothy Greene, testified that Danaher, as API's corporate parent, "pays for the actual lawyer bill" (Dkt. No. 90-11, p. 20), he also testified that the payments pass through a general disbursement account and are ultimately attributed to API. Specifically, Dr. Greene testified:

> So the check would say either Danaher Corporation or DH Holdings, or one of the top or second level holding corporations. Then on the stub of the check, it's coded to the financial responsibility center, that is linked to API.

Dkt. No. 90-11, p. 20. Dr. Greene further testified that if no other corporate affiliate is named as a defendant in the lawsuit, any payments by the holding company are allocated "100 percent [to] API." Dkt. No. 94-2, p. 3. This Court agrees with API that "[a]n entity's constitutional standing to seek redress in the courts is not dependent upon internal corporate accounting practices." Dkt. No. 94, p. 25.

In an analogous case, *2800 Hyland Blvd. v. Motiva Enters.*, No. 09 Civ. 5065(JFK), 2011 WL 11672773, at *4 (S.D.N.Y. 2011), plaintiff property owners sued the defendants, a joint venture between Shell Oil Company and Saudi Refining, Inc., to recover remediation costs associated with the cleanup of discharged petroleum. The defendants argued that the plaintiffs lacked standing to sue for these remediation costs because a third party, Marx Realty, paid for the cleanup equipment. *Id.* The court rejected this argument, holding that the plaintiffs had standing to sue because, although Marx Realty purchased the cleanup equipment, the underlying funds belonged to the plaintiffs:

> Although the Property is co-owned by Plaintiffs Rofar Realty and 2800 Hylan Blvd., LLC, Marx Realty is the entity responsible for collecting rent and paying bills for the Property. . . . BoA initially covered the cost of the vapor mitigation system, but sought reimbursement from Plaintiffs. In turn, Marx Realty

7

> forwarded the money for the vapor mitigation system to BoA from the rents it
> collected on behalf of Plaintiffs, and then itemized that expense as a
> receivable that would be redistributed to Plaintiffs once paid by Shell. . . . Marx
> Realty is little more than a conduit. It did not front the money for the
> remediation out of the management fees it earns; Plaintiffs are the source of
> the $26,940, and, therefore, they have standing to sue for reimbursement.
> There is no sense in requiring Marx Realty to initiate a lawsuit for funds that
> Defendants admit are due and owing, where the agent will simply channel the
> entirety of those funds back to Plaintiffs.

*Motiva Enters.*, 2011 WL 11672773, at *4.  Like in *Motiva Enters.*, where the vice president

of Marx Realty testified that the funds in question belong to the plaintiffs, here Dr. Greene

testified that the payments made in the Underlying Suits are attributable "100 percent [to]

API."  Dkt. No. 94-2, p. 3.  In this regard, Danaher, like Marx Realty, is "little more than a

conduit," whereas API incurs the actual losses.  *Motiva Enters.*, 2011 WL 11672773, at *4.

Accordingly, this Court finds that API has suffered an "injury in fact" regarding past defense

costs, conferring standing.[2]

It necessarily follows that API has standing to pursue payments not yet made

toward defending, settling, or satisfying judgments in the Underlying Lawsuits.  API's

Complaint seeks a declaration that the Insurers must reimburse it for past defense costs,

---

[2] The cases cited by the Insurers do not compel a different conclusion as they are factually distinguishable. For example, in *United Healthcare Servs., Inc. v. Aspirinio*, 16 N.Y.S.3d 139 (N.Y. Sup. Ct. 2015), the Court held that the plaintiff insurance company was not an alleged consumer of the defendant health provider's medical services, and "absent an applicable statute or a contractual agreement between [the parties]," there was no legal basis to compel the defendant to charge less for its services.  In this case, API is seeking a declaration of its rights under its existing contract with the Insurers.  In *Ross v. AXA Equitable Life Insurance Co.*, 115 F. Supp. 3d 424 (S.D.N.Y. 2015), the court found that the plaintiff insurers had not suffered an injury in fact, as required for Article III standing, because the alleged harm from defendant's shadow transactions implicated only an abstract interest in accurate information, rather than a concrete injury.  In contrast, API has alleged concrete financial losses related to the defense of the Underlying Lawsuits.  Three of the remaining cases cited by the Insurers - *Nature's Plus Nordic A/S v. Natural Organics, Inc.*, 980 F. Supp. 2d 400, 409 (E.D.N.Y. 2013), *Alassaf v. Travelers Cas. Ins. Co. of Am.*, No. 14 C 214, 2016 U.S. Dist. LEXIS 98870, at *11-12 (N.D. Ill. July 28, 2016), *Williams v. Certain Underwriters at Lloyd's of London*, 398 F. App'x 44, 47- 49 (5th Cir. 2010) - involve attempts by a plaintiff to recover benefits under a contract to which it was not a party. In contrast, API has a contractual relationship with each of the Insurers through the Primary Policies.  Finally, *Caprer v. Nussbaum*, 36 A.D.3d 176, 181-86 (2d Dep't 2006), explored when a tenant in common has standing to sue, an issue that is not implicated by this case.

and also pay API's future defense fees and costs, settlements, and judgments.  Dkt. No. 1, ¶ 33(b)-(c).  There is no question that API continues to sustain losses in defending the Underlying Lawsuits.  Because API's losses are imminent, the company indisputably has standing to pursue declaratory relief concerning future amounts not yet funded.  *See Beazley Ins. Co. v. Ace Am. Ins. Co.*, 150 F. Supp. 3d 345, 356 (S.D.N.Y. 2015) (finding standing in an insurance coverage declaratory judgment action because "standing doctrine does not require injury that has already occurred, but rather" one that is "actual *or* imminent") (emphasis in original).

Summary Judgment Standard

Turning to the parties' Summary Judgment Motions, such relief is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  A factual dispute is material "only if it has some effect on the outcome of the suit."  *Eagley v. State Farm Ins. Co.*, No. 13-CV-6653, 2015 WL 5714402, at *5 (W.D.N.Y. Sept. 29, 2015) (citation and quotation omitted).  A genuine issue exists as to a material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether an issue is genuine, "[t]he inferences to be drawn from the underlying affidavits, exhibits, interrogatory answers, and depositions must be viewed in the light most favorable to the party opposing the motion."  *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 202 (2d Cir. 1995) (citing *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (per curiam), and *Ramseur v. Chase Manhattan Bank*, 865 F.2d 460, 465 (2d Cir. 1989)).

Statute of Limitations

The Insurers argue that they are entitled to summary judgment on statute of limitations grounds because each of them denied coverage more than six years prior to its filing.  The statute of limitations is an affirmative defense, which the Insurers bear the burden of proving.  *Overall v. Estate of Klotz*, 52 F.3d 398, 403 (2d Cir. 1995).  To do so, the Insurers must establish that more than six years passed since API's cause of action accrued.  *Loiodice v. BMW of N. Am., LLC*, 125 A.D.3d 723, 725 (2d Dep't 2015); N.Y. C.P.L.R. § 213(2) (New York's six-year limit for breach of contract claims).  An action such as this "accrues" when an insurer denies liability for a claim, thereby breaching the contract. *Niagara Frontier Transp. Auth. v. ENCON Underwriting Agency, Inc*., 185 A.D.2d 642, 642 (4th Dep't 1992); *Cont'l Cas. Co. v. Stronghold Ins. Co*., 866 F. Supp. 143, 145 (S.D.N.Y. 1994) ("It is only when an insurer declines to pay a covered loss for which the insured has requested payment that the insurer has breached the insurance agreement by failing to perform its contractual obligations.")

The Insurers cite to several letters that they contend constitute a denial of coverage.  A review of these letters reveals that none of them actually deny coverage for the Underlying Lawsuits.  To the contrary, in its March 8, 2002 letter, Federal explicitly "agreed to participate in the defense of" the asbestos lawsuit under its Primary Policies, while "reserving all rights."  Dkt. No. 91-37, p. 1.  Federal's March 25, 2002 letter expressly states, "Federal will participate in the defense of this matter under" its Primary Policies, while reserving "the right to amend or supplement the coverage position stated herein should additional information bear upon the issue of insurance coverage."  Dkt. No. 91-38,

p. 2.[3]  In the view of this Court, reserving the right to deny coverage at a later date is not equivalent to actually denying coverage.

In an October 15, 2003 letter, North River explicitly declined to take a coverage position on its Primary Policy because it had not located a copy of it.  Dkt. No. 91-36, p. 3.  North River requested that API forward its copy of the Primary Policy or secondary evidence thereof, while reserving its "right to review" it "along with the facts and allegations" of the asbestos lawsuits and "advise API of its rights, if any," under that Policy.  Dkt. No. 91-36, p. 3.[4]  Although North River reserved rights with respect to whether the defendants in the asbestos lawsuits qualify as insureds, it did so only with respect to its umbrella policies, which are not at issue in this litigation.  Dkt. No. 91-36, p. 7 (stating "North River reserves the right to deny coverage to any API Entities for the referenced complaints based upon the definitions of 'Named Insured' and 'Insured' under the Umbrella Policies").  North River's contention that this reservation applies to its Primary Policy, rather than just its umbrella policies, is belied by the express language of its letter.

Finally, Fireman's Fund cites to four letters it contends triggered the statute of limitations, but none of these constitute a denial of coverage.  Dkt. No. 91-45, pp. 8-9.  In its October 27, 2005 letter, Fireman's Fund simply requests additional information about the relationship between API and other entities without providing a coverage position.  Dkt. No. 91-19.  In four nearly identical letters dated December 5, 2006, December 13, 2007,

_____

[3] Both letters addressed and denied coverage under additional insurance policies sold to API by Federal, but none of those insurance policies are at issue in this litigation.
[4] API and North River entered a stipulation in January of 2019 regarding the existence of its Primary Policy. Dkt. No. 87-2, pp. 4-6.

December 11, 2009, and March 6, 2012, Fireman's Fund requested information regarding API's relationship with the entities named as defendants in the Underlying Lawsuits.  Dkt. Nos. 91-21, 91-22, 91-23, and 91-24.  But none of these letters deny coverage.  In fact, they all seem to acknowledge Fireman Fund's duty to defend and/or indemnify API, stating that Fireman's Fund "continues to monitor these cases should" it "be called to make an equitable contribution to any settlement payments if needed."  Dkt. No. 91-23, p. 2.

Because the Insurers have failed to show that they denied API's request for coverage more than six years prior to the filing of the complaint, their request for summary judgment on statute of limitations grounds should be denied.

Named Insured

Much of the argument in this case arises from the fact that the Underlying Lawsuits name as defendants the former subsidiaries of API - Airtech, Basco, and/or Heat Transfer – rather than API itself.  The Insurers argue that "API's complaint fails as a matter of law because it does not seek coverage for defense costs associated with the Underlying Lawsuits made against entities other than API[,]" which are not named insureds under the Primary Policies.  Dkt. No. 90-45.  This argument ignores both the very broad nature of an insurer's duty to defend and an insurer's obligation under New York law to consider facts within its knowledge which would bring a claim within its policy's coverage.

Under New York law, an insurer's duty to defend is "exceedingly broad" and "distinct from its duty to indemnify."  *Euchner-USA, Inc. v. Hartford Cas. Ins. Co.*, 754 F.3d 136, 140 (2d Cir. 2014) (citing *Auto. Ins. Co. of Hartford v. Cook,* 7 N.Y.3d 131, 137 (2006)

(quotation marks omitted). The "duty to defend" is determined by pleadings whereas "the duty to pay" is predicated on a finding or an admission that the insured is in fact liable to a third party. *Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford,* 64 N.Y.2d 419, 424 (1985).

An insurer's duty to defend its insured arises under New York law "whenever the allegations in a complaint state a cause of action that gives rise to the reasonable possibility of recovery under the policy." *Town of Massena v. Healthcare Underwriters Mut. Ins. Co.*, 98 N.Y.2d 435, 443 (2002). The duty to defend requires insurers to defend an action regardless of merit provided it seeks damages potentially within coverage. *United Specialty Ins. Co. v. CDC Housing, Inc.*, 233 F. Supp. 3d 408, 412 (S.D.N.Y. 2017). An insurer may refuse to defend only where "there is no possible factual or legal basis on which the insurer might eventually be held to be obligated to indemnify the insured under any provision of the insurance policy." *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 115 (2d Cir. 2005) (internal brackets and citations omitted).

In determining whether an insurer has a duty to defend, a court must consider the policy as the "primary point of reference." *Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61, 68 (1991). The Primary Policies issued to API by North River and FFIC explicitly state "the Company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations are groundless, false, or fraudulent …." Dkt. No. 87-2, p. 8; Dkt. No. 87-2, p. 31. They also agreed to "pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence …." Dkt. No 87-2, p. 8; Dkt. No. 87-

13

2, p. 31.  For its part, Federal agreed to "defend any claim or suit against the insured seeking such damages," "pay in addition to the applicable limit of insurance the defense expense," and "pay any damages the insured becomes legally obligated to pay by reason of liability imposed by law or assumed under an insured contract because of bodily injury or property damage caused by an occurrence; or personal injury or advertising injury to which this insurance applies."  Dkt. No. 33-10, p. 15.

By their plain language, the Primary Policies cover claims seeking "damages" for "bodily injury" caused by an occurrence for which API would become "legally obligated to pay."  In the Underlying Suits, the claimants seek damages for bodily injury (or death) resulting from exposure to asbestos contained in API's products prior to 1996.  Although API conveyed assets in its various corporate transfers, it never conveyed its liabilities.  Dkt. No. 105, ¶ 24.  In this regard, API retained liability for claims arising out of injurious exposure to its pre-1996 products. Dkt. No. 105, ¶ 24.  If it was determined that API's products caused the bodily injuries suffered by these claimants, the Insurers would be "legally obligated to pay" or indemnify API.

Given this very viable basis for indemnification, it necessarily follows that the Insurers are duty-bound to defend API in the Underlying Lawsuits.  Under the circumstances, it cannot be said that there is "no possible factual or legal basis" upon which North River, Federal, and Fireman's Fund "might eventually be held to be obligated to indemnify" API.  As such, the Insurers were not justified in declining to defend the Underlying Lawsuits.  *See Allianz Ins. Co*, 416 F.3d at 115; *Town of Messena*, 98 N.Y.2d at 443.

14

That the Underlying Lawsuits name as defendants the former subsidiaries of API, rather than API itself, does not absolve the Insurers of the duty to defend API under the applicable law.  New York courts have routinely held that an insured is still entitled to coverage even when a claimant erroneously fails to name the insured as a defendant in a complaint where extrinsic facts known to the insurer establish that the insured is the proper focus of the claimant's allegations.  *See City of N.Y. v. Wausau Underwriters Ins. Co.*, 145 A.D.3d 614, 618-19 (1st Dep't 2016) ("It is of no moment that Hellman, the named insured on the Wausau policy, was not named in the complaint."); *Chatham Corp. v. Argonaut Ins. Co.*, 334 N.Y.S.2d 959, 960-61 (Sup. Ct. 1972) ("[T]he failure to include [the insured] as a defendant in the third-party action or to name it in the pleadings is not fatal, provided it can be ascertained that [the insured], rather than some other party, is the subject of the complaint brought by the third-party plaintiff.").

The Second Circuit Court of Appeals has repeatedly held that under New York law, insurers must consider facts within their actual knowledge when assessing whether they have a duty to defend, even if those facts fall outside the four corners of the complaint.  *High Point Design, LLC v. L.M. Ins. Corp.*, 911 F.3d 89, 96-97 (2d Cir. 2018); *Allianz*, 416 F.3d at 115; *U.S. Fid. & Guar. Co. v. Exec. Ins. Co.*, 893 F.2d 517, 519 (2d Cir. 1990).  "Where, as here, the insurer has knowledge of facts which potentially bring the claim within the coverage of the policy, it has a duty to defend even though the allegations of the complaint fail sufficiently to allege all of the facts requisite to do so."  *Commercial Pipe & Supply Corp. v. Allstate Ins. Co.*, 36 A.D.2d 412, 415 (4th Dep't 1971), *aff'd* 30 N.Y.2d 619 (1972); *see also Sucrest Corp. v. Fisher Governor Co.*, 371 N.Y.S.2d 927, 937-38 (Sup. Ct. 1975) ("[W]here the complaint alleges facts without the coverage of the policy, but the

15

carrier has knowledge of facts indicating coverage, the insurer is to be guided, not exclusively by the allegations of the complaint, but also by the facts known to it.").

In *Fitzpatrick*, 78 N.Y.2d at 63, the New York Court of Appeals explained why an insurer must consider known facts extrinsic to the complaint when deciding whether they must provide coverage to an insured.  In *Fitzpatrick*, the claimant sued for the wrongful death of her husband who was killed operating an all-terrain vehicle.  *Fitzpatrick*, 78 N.Y.2d at 63.  The claimant incorrectly alleged Frank Moramarco owned the vehicle and gave her husband permission to use it.  *Id.*  In reality, Cherrywood Landscaping, Inc. ("CLI") owned the vehicle and Moramarco was "an officer, shareholder and director" of CLI.  *Id.*  CLI, which was not named as a defendant in the lawsuit, held a liability insurance policy, which covered Moramarco, but only while he was acting within his duties as an "executive officer, director or stockholder."  *Id.* at 63-64.  The insurer denied coverage to Moramarco because the "complaint did not name CLI, and Moramarco, the named defendant, was not insured as an individual."  *Id.* at 64.

In the lawsuit that followed, the trial court denied the insurer's motion to dismiss, but the New York Appellate Division reversed and found no coverage because the complaint, which it considered determinative, did not name CLI as a defendant.  *Id.* at 64-65.  The New York Court of Appeals found the insurer had a duty to defend Moramarco despite the fact that CLI was not named in the underlying complaint.  Applying the extrinsic facts rule, the Court of Appeals found that "had the complaint correctly identified Moramarco as an officer and/or shareholder of the insured CLI, he would have unquestionably been covered for this lawsuit . . . ."  *Id.* at 69.  "To deny Moramarco an insurance-company

16

sponsored defense under these circumstances merely because the attorney for the plaintiff

in the main action accidentally mischaracterized Moramarco's role would be to afford the

insurer an undeserved windfall at the expense of its insured." *Id.*

The Court of Appeals concluded that "invocation of the [four corners of the

complaint] rule here and in analogous cases leads to an unjust result, since it exalts form

over substance and denies an insured party the benefit of the 'litigation insurance' for which

it has paid." *Id.* at 70. The rule, instead, is that an insurer must "provide a defense where,

notwithstanding the complaint allegations, underlying facts made known to the insurer

create a 'reasonable possibility that the insured may be held liable for some act or omission

covered by the policy.'" *Id.* at 70 (quoting *A. Meyers & Sons Corp. v. Zurich Am. Ins. Grp.*,

74 N.Y.2d 298, 302 (1989)). The *Fitzpatrick* Court reasoned:

> The conclusion we reach here flows naturally from the fact that the duty to
> defend derives, in the first instance, not from the complaint drafted by a third
> party, but rather from the insurer's own contract with the insured . . . . While
> the allegations in the complaint may provide the significant and usual
> touchstone for determining whether the insurer is contractually bound to
> provide a defense, the contract itself must always remain a primary point of
> reference …. Indeed, a contrary rule making the terms of the complaint
> controlling "would allow the insurer to construct a formal fortress of the third
> party's pleadings … thereby successfully ignoring true but unpleaded facts
> within its knowledge that require it … to conduct the … insured's
> defense" *(Associated Indem. Co. v. Insurance Co.,* 68 Ill. App. 3d 807, 816-
> 817, 386 N.E.2d 529, 536). Further, an insured's right to a defense should not
> depend solely on the allegations a third party chooses to put in the complaint.
> This is particularly so because the drafter of the pleading may be unaware of
> the true underlying facts or the nuances that may affect the defendant's
> coverage and it might not be in the insured's (or the insurer's) interest to
> reveal them.

*Fitzpatrick*, 78 N.Y.2d at 68. Put another way, the allegations within the "four corners of the

complaint" establish the floor, not the ceiling, of an insurer's duty to defend. *Fitzpatrick*, 78

N.Y.2d at 66 ("[A]n insurer's duty to defend is **at least** broad enough to apply when the 'four

corners of the complaint' rule suggests the reasonable possibility of coverage." (emphasis added)).

The extrinsic facts rule compels a finding that the Insurers must defend API in the Underlying Lawsuits, notwithstanding the fact that API is not named as a defendant. The record shows that the Insurers are aware that the plaintiffs in the Underlying Lawsuits were exposed to asbestos – possibly from products manufactured by API – prior to 1996; that the former subsidiaries named in the Underlying Lawsuits (AirTech, Basco, and Heat Transfer) did not exist until 1996; that previous to 1996, API operated similarly-named divisions not as separate corporate entities but as part of API; and when API formed AirTech, Basco, and Heat Transfer as subsidiary companies in 1996, it conveyed assets but no liabilities to them.  In other words, the Insurers know that the Underlying Lawsuits seek compensation for bodily injuries allegedly caused by API's products during the periods covered by the Primary Policies.

As previously noted, the Primary Policies require the Insurers to "defend any suit against the insured seeking damages on account of such bodily injury or property damage, even if any of the allegations are groundless, false, or fraudulent . . . ." (Dkt. No. 87-2, p. 8; Dkt. No. 87-2, p. 31), and "defend any claim or suit against the insured seeking such damages," "because of bodily injury or property damage caused by an occurrence; or personal injury or advertising injury to which this insurance applies."  Dkt. No. 33-10, p. 15. The Underlying Lawsuits clearly fall within the scope of this stated coverage.

The Insurers know that API retained the liability for bodily injury caused by its pre-1996 products.  Thus, they cannot deny coverage simply because the third-party plaintiffs erroneously named API's former subsidiaries as defendants in the case.  If the claimants had named API as a defendant, rather than AirTech, Basco, and/or Heat Transfer, the Insurers undoubtedly would have to defend the Underlying Lawsuits.  Permitting the Insurers to avoid coverage because the third-party plaintiffs were unaware of API's complicated corporate history would yield an "unjust result" and an "undeserved windfall" for the Insurers.  Accordingly, the Insurers' motion for summary judgment on this basis should be denied.

Coverage for Former API Subsidiaries Under the 1996-97 Federal Policy

API contends that Federal must defend and indemnify API's former subsidiaries under the "Subsidiaries or Newly Acquired or Formed Organizations" provision in the 1996-97 Federal Policy ("Subsidiaries Provision").  This Court previously denied API's request to amend its Complaint to assert this cause of action finding that the amendment was untimely and prejudicial.  Dkt. No. 86.  Therefore, API is foreclosed from offering proof of this theory of liability in this proceeding.

Even if it were not, this theory would nonetheless fail because the Subsidiaries Provision states that a subsidiary will qualify as a named insured only "[i]f there is no other similar insurance available."  Dkt. No. 87-1, pp. 14-15 (check); Dkt. No. 97, p. 25.  The Insurers have offered proof — specifically, an expert report — establishing that liability coverage without asbestos exclusions was available in the insurance market during the 1996-97 Policy Period.  Dkt. No. 99-1.  In this regard, similar insurance was arguably

19

available to API's subsidiaries.  At a minimum, this creates a genuine issue of material fact as to whether API's former subsidiaries qualified as "named insureds" under the 1996-97 Federal Policy, which precludes summary judgment.  Accordingly, API's motion for summary judgment on this theory of liability must be denied. [5]

Allocation of Costs in "Long Tail" Claims

Claims by plaintiffs seeking to recover for personal injuries due to gradual or continuing exposure to toxic substances such as asbestos are known as "long-tail" claims.  *In re Viking Pump, Inc.*, 27 N.Y.3d 244, 255 (2016).  Long tail claims "often involve exposure to an injury-inducing harm over the course of multiple policy periods, spawning litigation over which policies are triggered in the first instance, how liability should be allocated among triggered policies and the respective insurers, and at what point insureds may turn to excess insurance for coverage." *Id.*

Two primary methods of allocation are used by the courts to apportion liability across multiple insurance policy periods for such long tail claims: "all sums" and "pro rata." *Keyspan Gas East Corp. v. Munich Reins. Am., Inc.*, 31 N.Y.3d 51, 58 (2018).  The "all sums" method, which is also known as joint and several allocation, permits the insured to collect its total liability under any policy in effect during the period that the damage occurred, up to the policy limits.  *Viking Pump*, 27 N.Y.3d at 255.  For "pro rata" allocation, "each insurance policy is allocated a 'pro rata' share of the total loss representing the

---

[5] The Insurers also contest that API is entitled to coverage based on a contractual indemnity theory.  *See, e.g.* Dkt. No. 90-45, p. 24 ("API may argue that it is entitled to coverage because either under the 1997 stock transfer or 2002 SPA, API remained contractually liable for the asbestos liabilities of API Basco/API Heat Transfer.").  API has not made such an argument and therefore, this Court need not address the issue.

portion of the loss that occurred during the policy period." *Id.* (quoting *Viking Pump*, 27 N.Y.3d at 256). "Pro rata" shares are commonly "calculated based on an insurer's 'time on the risk,' a fractional amount corresponding to the duration of the coverage provided by each insurer in relation to the total loss." *Id.* In New York, the method of allocation is determined by the language of the relevant insurance policy. *Id.*

In *Consolidated Edison Co. of N.Y. v. Allstate Ins. Co.*, for example, the New York Court of Appeals determined that policy language providing that an insurer must indemnify an insured for liability that resulted from an accident or occurrence "during the policy period" generally supports "pro rata" allocation. 98 N.Y.2d 208, 224 (2002).

In contrast, the *In re Viking Pump* matter involved a policy with non-cumulation clauses and prior insurance provisions. 27 N.Y.3d at 258. The Court of Appeals reasoned that such provisions "plainly contemplate that multiple successive insurance policies can indemnify the insured for the same loss or occurrence[,]" and therefore were inconsistent with "pro rata" allocation. *In re Viking Pump*, 27 N.Y.3d at 261. "[T]he very essence of pro rata allocation is that the insurance policy language limits indemnification to losses and occurrences during the policy period." *Id.* The court explained:

> Pro rata allocation is a legal fiction designed to treat continuous and indivisible injuries as distinct in each policy period as a result of the 'during the policy period' limitation, despite the fact that the injuries may not actually be capable of being confined to specific time periods. The non-cumulation clause negates that premise by presupposing that two policies may be called upon to indemnify the insured for the same loss or occurrence.

*Id.* at 261. Where a policy by its plain language extends indemnification to losses and occurrences beyond the policy period, "all sums" is the appropriate allocation method. *Id.*

SPA-22

API argues that the language of the Primary Policies compels an "all sums" approach, while the Insurers contend that the costs must be allocated on a "pro rata" or "time on the risk" basis.  This Court turns first to the Insurers' Motion to Strike relevant portions of API's briefing on this particular matter.

Motion to Strike API's "All Sums" Argument

The Insurers jointly move to strike API's Reply Brief in support of its Motion for Summary Judgment (Dkt. No. 96-1), seeking to exclude API's argument, made in response to the Insurers' Joint Motion for Partial Summary Judgment on Allocation and Voluntary Payments (Dkt. No. 89), that the Insurers must contribute to the indemnification of resolved claims, past, present, and future on an "all sums" basis.  Dkt. No. 96, p. 1.  In principle, the Insurers argue that API should have made its "all sums" argument when it filed its initial Motion for Summary Judgment, rather than in a "belated" Cross-Motion for Summary Judgment.  Dkt. No. 109-1, p. 2.  This Court does not agree.

A review of the docket shows that the parties filed motions for summary judgment on July 10, 2020, consistent with the Court's scheduling order.  Dkt. Nos. 87, 89, 90, 91.  API argued that the Primary Policies require the Insurers to collectively defend the asbestos lawsuits and fund all defense fees and costs, and to contribute toward API's past and future asbestos settlements and judgments.  Dkt. No. 87-1.  The Insurers filed three motions on that date, including a Motion for Partial Summary Judgment on Allocation and Voluntary Payments.  Dkt. Nos. 89.  In their Motion, the Insurers substantively argued that API is liable for its "pro rata" share of loss for periods of no insurance, self-insurance, lost policies, and policies purchased from insurers who became insolvent, and that the defense

costs for the asbestos suits must be allocated on a "pro rata" "time on the risk" basis.  Dkt.

No. 89-45.

On August 28, 2020, API filed its brief in Opposition to the Insurers' Motion

and cross-moved for summary judgment.  Dkt. No. 96-1.  API argued that each Insurer had

a duty to defend the entire action, and that the Insurers must pay indemnity on an "all sums"

basis.  After API's Cross-Motion was fully briefed (with the Insurers exceeding the page limit

on their responding brief), the Insurers filed the current motion to strike API's Reply Brief.

The Insurers argue that Local Rule 7(b)(2)(A) "contemplates the filing of

cross-motions for summary judgment only if the Court does not set deadlines by order."

Dkt. No. 109-1, ¶ 7.  They contend that API engaged in "gamesmanship" to try to "get the

last word in."  Dkt. No. 109-1 at ¶ 7.  As API noted, the Insurers' "argument is curious at best

because any party that files a motion or a cross-motion always 'gets the last word in'

through its reply brief.  Thus, whether API made these arguments in its July 10 motion for

summary judgment or in its cross[-]motion for summary judgment, API [would always] have

the last word."  Dkt. No. 110, p. 6.  In this regard, the Insurers cannot claim prejudice, and in

any event, this Court finds none.

Moreover, the Court generally allows cross-motions for summary judgment

provided they are filed by the scheduled deadline for filing opposition briefs.  *See Hahnel v.*

*United States*, 782 F. Supp. 2d 20, 31 (W.D.N.Y. 2011) ("This Court has routinely permitted

litigants to file a cross-motion in response to a dispositive motion, even though the deadline

for filing dispositive motions had passed, provided that such cross-motions were filed by the

deadline established for filing opposing papers, as set by the Court's Motion Scheduling Order."). This Court's scheduling order directed that responses to the Insurers' various motions for summary judgment be filed by August 28, 2020. Dkt. No. 93. API filed its cross-motion on that date. Dkt. No. 96-1.

Further, API's cross-motion sought summary judgment on one of the same issues on which the Insurers moved, allocation. *Burzynski v. United States*, 13-CV-766S, 2016 WL 6298513, at *8 (W.D.N.Y. Oct. 27, 2016) (noting that a court can consider a cross-motion where the motion "seeks summary judgment on the very same claims on which [the movant] has moved for summary judgment"). Accordingly, this Court denies the Insurers' Motion to Strike API's Reply Brief in Support of its Cross-Motion for Summary Judgment (Dkt. No. 109).

<u>All Sums or Pro Rata</u>

Returning to the issue of which allocation methodology should prevail, it is noted that "New York [courts] have not adopted a strict pro rata or all sums allocation rule." *Keyspan*, 31 N.Y.3d at 58. Rather, "the method of allocation is governed foremost by the particular language of the relevant insurance policy." *Id.* In this case, each of the Primary Policies covers not only bodily injury "during the policy period," but also "death at any time"[6] resulting from the bodily injury. Dkt. No. 105, ¶¶ 14-18. The "death at any time" provision necessarily extends the protection of each Primary Policy beyond the policy period. As API argues, there would be no need for the "at any time" language if the policy

---

[6] According to API's Claims Bordereau (Dkt. No. 89-17), more than 300 claims have been made on behalf of deceased persons.

24

only covered death occurring during the policy period.  Dkt. No, 108, p. 5.  Because a "pro rata" allocation is premised on each policy paying only that loss which occurs during the policy period, the "death at any time" provision, which necessarily covers losses outside the policy period, contradicts "the very essence of pro rata allocation."  *Viking Pump*, 27 N.Y.3d at 261.

The death "at any time" language unquestionably supports "all sums" allocation in this case.  As the New York Court of Appeals has held, a policy provision that "expressly extends a policy's protection beyond the policy period … compels an interpretation in favor of all sums allocation."  *Viking Pump*, 27 N.Y.3d at 262.  The fact that the Primary Policies do not contain non-cumulation clauses is not dispositive.  As the *Viking Pump* Court explained:

> The continuing coverage clause expressly extends a policy's protections beyond the policy period for continuing injuries. Yet, under a pro rata allocation, no policy covers a loss that began during a particular policy period and continued after termination of that period because that subsequent loss would be apportioned to the next policy period as its pro rata share. Using the pro rata allocation would, therefore, render the continuing coverage clause irrelevant.

*Viking Pump*, 27 N.Y.3d at 262.  Rendering a provision surplusage is "a construction that cannot be countenanced under [New York's] principles of contract interpretation."  *Id.* at 261.

The other cases relied upon by the Insurers do not compel a different conclusion.  *New England Insulation Co. v. Liberty Mut. Ins. Co.*, 988 N.E.2d 450 (Mass. App. Ct. 2013) applies Massachusetts law, not New York law; and therefore, it is not controlling here.  In *Danaher Corp. v. Travelers Indem. Co.*, 414 F. Supp. 3d 436, 459-60

(S.D.N.Y. 2019), the court resolved whether a "Two or More Policies" provision was equivalent to a non-cumulation clause and found that it was "intended to prevent [the insured's] stacking of *concurrent* policies issued by [the insurer]." This case addresses whether the Primary Policies reflect the parties' understanding that multiple *successive* insurance policies could indemnify the insured for the same loss or occurrence. The remaining cases cited by the Insurers — *Liberty Mut. Fire Ins. Co. v. J. & S. Supply Corp.*, 2015 U.S. Dist. LEXIS 177124, at *20-21, *25 (S.D.N.Y. 2015); *Roman Catholic Diocese of Brooklyn v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 21 N.Y.3d 139, 148, 154-55 (2013); *Stonewall Ins. Co. v. Nat'l Gypsum Co.*, 1992 WL 163180, at *1 (S.D.N.Y. 1992); *Uniroyal, Inc. v. Home Ins. Co.*, 707 F. Supp. 1368 (E.D.N.Y. 1988)) — all predate *Viking Pump*.

Moreover, *Viking Pump* explicitly abrogated the authority upon which *J. & S. Supply* relied, *Olin Corp. v. American Home Assurance Co.* ("Olin III"), 704 F.3d 89 (2d Cir. 2012). In *Olin III*, the Second Circuit concluded that a "continuing coverage" provision is not fundamentally inconsistent with "pro rata" allocation. *Olin III*, 704 F.3d at 102. Four years later, *Viking Pump* held that a "continuing coverage" provision identical to that considered in *Olin III* required an "all sums" allocation. *See Viking Pump*, 27 N.Y.3d at 263-64 (rejecting the Second Circuit Court of Appeals' attempt to "harmonize" non-cumulation clauses with a "pro rata" allocation); *Olin Corp. v. OneBeacon Am. Ins. Co. ("Olin IV")*, 864 F.3d 130, 143-44 (2d Cir. 2017) (noting that Viking Pump required "modification of the approach" the Second Circuit had taken in *Olin III* to apply "all sums" allocation). Accordingly, this Court finds that the language of the Primary Policies calls for an "all sums" allocation.

Voluntary Payments

The Insurers argue that API is not entitled to indemnification for any settlement payments[7] because the Primary Policies prohibit an insured from making any voluntary payments without the Insurers' consent.  Dkt. No. 89-45, pp. 20-21.  Under New York law, an insurer that breaches its obligation to defend its insured cannot require that insured to obtain its consent before settling the claim.  *See, e.g., Am. Ref-Fuel Co. of Hempstead v. Resource Recycling, Inc.*, 722 N.Y.S.2d 570 (App. Div. 2001) (holding that denial of coverage excused the policyholder from complying with the term of the policy obligating it to obtain the insurer's consent before settling any matter).  Put another way, after an insurer denies liability for a claim, its insured may enter into reasonable settlement without prejudicing its rights against the insurer.  *Bunge Corp. v. London & Overseas Ins. Co.*, 394 F.2d 496, 497 (2d Cir. 1968); *Prudential Lines, Inc. v. Firemen's Ins. Co.*, 91 A.D.2d 1, 5 (1st Dep't 1982) ("[W]here an insurer has denied its liability under a policy, the insured may enter into a settlement with a third party . . . without prejudicing its rights against the insurer."); *Sucrest Corp. v. Fisher Governor Co.*, 371 N.Y.S.2d 927, 940 (N.Y. Sup. Ct. 1975) (finding that where an insurer refuses to defend without justification, the consent provision may be disregarded and the insured is entitled to reimbursement for reasonable settlements).

It is undisputed that for years prior to this protracted litigation, API unsuccessfully sought coverage from the Insurers, while the Insurers reserved their rights to deny it.  Because the Insurers did not participate in API's defense, they cannot now refuse to indemnify API for settling a case because such settlement violates the voluntary payment

---

[7] To date, API has settled one case, *Murphy v. Rapid Am. Corp. et al.*, No. 09-L-00784 (Circuit Court of Cook County, Illinois), for $15,000.  Dkt. No. 105, ¶ 26; Dkt. No. 89-45, p. 20.

27

provisions in the Primary Policies.  Accordingly, the Insurers' Motion for Summary Judgment on this basis should be denied.

## **CONCLUSION**

For the foregoing reasons, it is RECOMMENDED that:

API's Motion for Summary Judgment (Dkt. No. 87) be GRANTED IN PART and DENIED IN PART;

The Insurers' Joint Motion for Partial Summary Judgment on Allocation and Voluntary Payments (Dkt. Nos. 89) be DENIED;

The Insurers' Joint Motion for Summary Judgment on the (1) Named Insured, (2) Standing, and (3) Contractual Indemnity Issues (Dkt. No. 90) be DENIED;

The Insurers' Joint Motion for Summary Judgment on Statute of Limitations (Dkt. No. 91) be DENIED; and

API's Cross-Motion for Summary Judgment (Dkt. No. 96) be GRANTED IN PART and DENIED IN PART.

It is further ORDERED that the Insurers' Motion to Strike (Dkt. No. 109) be DENIED.

Therefore, it is hereby **ORDERED** pursuant to 28 U.S.C. § 636(b)(1) that:

This Report, Recommendation, and Order be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b)(2) and Local Rule 72.  **Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Judge's Order**.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988).

The parties are reminded that, pursuant to Rule 72 of the Local Rules for the Western District of New York, "written objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection, and shall be supported by legal authority."  **Failure to comply with the provisions of Local Rule 72 may result in the District Judge's refusal to consider the objection**.

The district judge will ordinarily refuse to consider *de novo*, arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance.  *See, e.g., Paterson-Leitch Co., Inc. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985 (1st Cir. 1988).  In accordance with the requirements set forth in Local Rule 72, "[a]ny party filing objections to a Magistrate Judge's order or recommended disposition must include with the objections to the District Judge a written statement either certifying that the objections do not raise new legal/factual arguments or

29

identifying the new arguments and explaining why they were not raised to the Magistrate

Judge."

      **SO ORDERED.**

DATED:     Buffalo, New York
           August 4, 2021

                            **_s/ H. Kenneth Schroeder, Jr._**
                            **H. KENNETH SCHROEDER, JR.**
                            **United States Magistrate Judge**

SPA-31

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════════

AMERICAN PRECISION INDUSTRIES, INC.,

                              Plaintiff,

        v.                                          **DECISION AND ORDER**
                                                    14-CV-1050

FEDERAL INSURANCE COMPANY,
FIREMAN'S FUND UNSURANCE COMPANY,
AND NORTH RIVER INSURANCE COMPANY,

                              Defendants.

═══════════════════════════════════

        Plaintiff American Precision Industries, Inc. ("API" or "Plaintiff") brought this

action seeking a declaratory judgment that Federal Insurance Company ("Federal"),

Fireman's Fund Insurance Company ("Fireman's Fund"), and North River Insurance

Company ("North River") (collectively, "the Insurers" or "Defendants") must defend and

indemnify API in several hundred asbestos-related personal injury lawsuits ("Asbestos

Lawsuits"), as well as reimburse API for all litigation costs it has already incurred with

respect to those suits.  Dkt. 1.  The Insurers issued primary comprehensive general

liability ("CGL") policies ("the Primary Policies") to API covering slightly more than half

the time between December 31, 1974 and April 1, 1997.  Dkt. 89-45.

        Pursuant to 28 U.S.C. § 636(b)(1)(A) and (B), the case was referred to

Magistrate Judge H. Kenneth Schroeder, Jr. for all pre-trial proceedings.  Dkt. 8.  On

July 10, 2020, API filed a motion for summary judgment and the Insurers filed three joint

motions for summary judgment.  Dkts. 87, 89-91.  In late August 2020, API filed a cross-

1

motion for summary judgment.  Dkt. 96.  In mid-October 2020, the Insurers filed a

motion to strike API's recently filed reply in support of its cross-motion for summary

judgment.  Dkt. 109.  On August 2, 2021, Magistrate Judge Schroeder issued a Report,

Recommendation, and Order ("RR&O") concerning each of these motions.  Dkt. 113.

The RR&O recommends: (1) granting in part and denying in part API's motion for

summary judgment; (2) denying the Insurers' joint motion for partial summary judgment

on allocation and voluntary payments; (3) denying the Insurers' joint motion for

summary judgment on the (a) named insured, (b) standing, and (c) contractual

indemnity issues; (4) denying the Insurers' joint motion for summary judgment on

statute of limitations grounds; and (5) granting in part and denying in part API's cross-

motion for summary judgment.  Additionally, the RR&O denies the Insurers' motion to

strike API's reply in support of its cross-motion for summary judgment.

On September 17, 2021, API filed timely objections to the RR&O.  Dkt. 117.  The

objections are limited to the portion of the RR&O that recommends the Court deny the

segment of API's motion for summary judgment that relies on the "Subsidiaries or Newly

Acquired or Formed Organizations" provision of the April 1, 1996 CGL policy issued by

Federal.

The Insurers also filed timely objections to the RR&O.  Dkt. 118.  They object on

three distinct grounds, specifically: (1) insofar as API is the only named insured, but the

Asbestos Lawsuits do not include API as a defendant, the Primary Policies are not

triggered; (2) the language of the Primary Policies requires pro rata allocation of any

required defense and indemnification; and (3) API's claims are time-barred.

2

On October 29, 2021, Federal filed a response in opposition to API's objections to the RR&O.  Dkt. 119.  Echoing the RR&O's determination, Federal argues that the Magistrate Judge's previous denial – via an April 2020 Decision and Order (Dkt. 86) – of API's motion for leave to file an amended complaint (Dkt. 72), which sought to add a new claim for coverage based on the "Subsidiaries or Newly Acquired or Formed Organizations" provision of the April 1, 1996 CGL policy issued by Federal, precludes API from asserting an argument based on that same theory at the summary judgment stage.

On November 1, 2021, API filed a response in opposition to the Insurers' objections to the RR&O.  Dkt. 120.  API argues that the Magistrate Judge correctly found that (1) the Asbestos Lawsuits are covered by the Primary Policies; (2) all sums allocation is required for both defense and indemnification; and (3) the Insurers' summary judgment motion based on the statute of limitations should be denied.

Oral argument took place on March 16, 2022.  Dkt. 130.  Two days later, the parties were directed to file responses to additional questions posed by the Court.  Dkt. 131.  Responses were filed, and the matter was deemed submitted.  Dkts. 132-36.

Pursuant to 28 U.S.C. § 636(b)(1)(C), to the extent that parties make timely and specific objections to a Magistrate Judge's Report and Recommendation, the standard of this Court's review is *de novo*.  *Id*.  The Court may also review a Magistrate Judge's pretrial Order where it has been shown to be clearly erroneous or contrary to law.  28 U.S.C. § 636(b)(1)(A).

Upon due consideration of the arguments, and after careful review of the voluminous record, the Court first finds that the Magistrate Judge correctly denied the

Insurers' motion to strike (Dkt. 109) API's reply in support of its cross-motion for summary judgment (Dkt. 108), for the reasons set forth in the RR&O.  Dkt. 113, p. 22-24.  As such, this Court will not disturb that ruling.

Next, the Court adopts the Magistrate Judge's conclusion that API has standing to assert its own rights to coverage under the Primary Policies, for the reasons articulated in the RR&O.  *Id*., p. 6-9.

The Court also adopts the reasoning and recommendation of the Magistrate Judge as set forth in the RR&O with respect to the statute of limitations.  *Id*., p. 10-12.  The Court emphasizes that it is adopting the Magistrate Judge's finding that the Insurers failed to offer proof that they actually denied coverage more than six years prior to API initiating this action.  To argue, as the Insurers do, that API was aware that entities other than named insureds were not entitled to coverage more than six years prior to initiation of this lawsuit simply conflates this issue with the named insured argument, to which the Court turns now.

The Magistrate Judge determined that the extrinsic facts rule compels coverage because the Insurers knew that API retained all liability for third-party bodily injuries allegedly caused by exposure to the products it manufactured prior to the September 1996 formation of the relevant subsidiaries.[1]  *Id*. at 12-19.  The Insurers' jointly object to this recommendation, which the parties addressed extensively during oral argument.

---

[1] The complex corporate history of API need not be recounted again here, other than to note that beginning in the 1960s, Air Technologies and Basco were simply divisions of API, contained within API's Heat Transfer Group.  Dkt. 87-2, Ex. B.  In September 1996, three new corporations were formed with similar names – API AirTech Inc., API Basco Inc., and API Heat Transfer Inc.  *Id*.  All three corporations were subsidiaries of API, but no liabilities were conveyed to the newly formed entities.  *Id*.

This Court, however, adopts the determination, set forth in detail in the RR&O, that allowing plaintiffs in the Asbestos Lawsuits to control the scope of coverage by virtue of their own filed complaints would yield an unjust result precluded by *Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61 (1991).  The scope of coverage is set forth in the Primary Policies; that is what the parties negotiated and what, accordingly, binds them.  Furthermore, API's complex corporate history is not easily navigable by third-party plaintiffs' counsel, and API asserts this common mistake was amplified by its strategic decision to not reveal that API itself retains liability.  The Insurers cannot escape their coverage obligations on this theory.

Proceeding to the crux of this matter, the Court rejects the Magistrate Judge's conclusion that the Insurers must provide indemnification on an all sums basis; however, it adopts the determination that all sums allocation is appropriate for defense costs.  Dkt. 113, p. 20-22, 24-26.  Allocation of long-tail claims is inherently complex, and clearly, the shadow of *In re Viking Pump, Inc.*, 27 N.Y.3d 244 (2016) looms large over the allocation issues in this case.  Despite the parties' extensive briefing on this issue, and the Court's independent efforts to uncover relevant post-*Viking Pump* case law, it appears this Court has the charmed distinction of deciding a matter of first impression.  Namely, this Court is tasked with determining whether certain language contained within the definitions of bodily injury in the Primary Policies, specifically pertaining to "death at any time," requires allocation of indemnity and defense on an all sums, as opposed to pro rata, basis.

This issue was first raised by Fireman's Fund and North River in their joint motion for partial summary judgment on allocation and voluntary payments.  Dkt. 89.  In their

memorandum, they emphasized that the general rule under New York law requires pro rata allocation of long-tail claim losses if the insurance policy language limits coverage to bodily injury or property damage that occurs "during the policy period," as do each of the Primary Policies.  Dkt. 89-45 (citing, among other case law, *Stonewall Ins. Co. v. Asbestos Claims Management Corp*., 73 F.3d 1178 (2d Cir. 1995); *Danaher Corp. v. Travelers Indem. Co.*, 414 F. Supp. 3d 436 (S.D.N.Y. 2019); *Keyspan Gas E. Corp. v. Munich Reinsurance Am., Inc.*, 31 N.Y.3d 51 (2018); and *Consolidated Edison Co. v. Allstate Ins. Co.*, 98 N.Y.2d 208 (2002)).  As something of a corollary, Fireman's Fund and North River then argued that *Viking Pump* established that all sums allocation was "only" appropriate for indemnification in circumstances where the insurance policy contained "non-cumulation clauses or non-cumulation and prior insurance provisions." Dkt. 89-45, p. 16.

Fireman's Fund and North River also asserted that defense costs must likewise be apportioned on a pro rata basis, citing case law which generally relied on considerations of equity and efficiency in reaching this conclusion.  Dkt. 89-45 (citing, among other case law, *Danaher, 414 F. Supp. 3d 436*; *Avondale Indus., Inc. v. Travelers Indem. Co.*, 774 F. Supp. 1416 (S.D.N.Y. 1991); and *Continental Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d 640 (1993)).

In a brief fashioned as both an opposition to Fireman's Fund and North River's joint motion for summary judgment on allocation and in support of its own cross-motion for summary judgment, API argued that New York law compelled all sums allocation of both indemnity and defense costs in this case.  Dkt. 96-1.  API quoted *Rapid-American* for the proposition that the duty to defend requires a full defense regardless of whether

the covered occurrence also triggers defense obligations under another insurance policy, because the insured purchased "litigation insurance" in order to avoid any confusion over responsibility for defense costs.  *Id.* at 14-15.  API also argued that the New York Court of Appeals has consistently exalted contract terms, and has even admonished the lower courts to "enforce [the agreements of parties to an insurance contract] without passing on the substance of them."  *J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 21 N.Y.3d 324, 334 (2013).

With respect to indemnification, API first noted that the Primary Policies all defined bodily injury as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom," or functionally equivalent language.  Dkt. 96-1 (citing Dkts. 89-15; 89-42; 89-43; 89-44; 90-13).[2]  API then argued that *Viking Pump* compels all sums allocation of indemnity here because the "death at any time" language extends the protections of the Primary Policies beyond each policy period, which is inconsistent with the theoretical basis of pro rata allocation of long-tail claims, just as with non-cumulation or continuing coverage clauses.  *See Id.* at 262 ("Pro rata allocation is a legal fiction designed to treat continuous and indivisible injuries as distinct in each policy period as a result of the 'during the policy period' limitation, despite the fact that the injuries may not actually be capable of being confined to specific time periods.").

To be sure, New York insurance law requires analysis and application of the relevant policy language in determining how to allocate indemnity and defense costs, as

---

[2] Although Federal did not join the motion API was responding to, API's cross-motion was directed against all Defendants.

7

opposed to simply exercising a general preference for pro rata or all sums allocation.

*See, e.g., Keyspan*, 31 N.Y.3d at 58 ("the method of allocation is governed foremost by

the particular language of the relevant insurance policy").  With respect to allocation of

indemnity, this Court does not agree with API's position that the "death at any time"

language contained within the definitions of bodily injury in the Primary Policies compels

all sums allocation.

The insurance policy provisions that the New York Court of Appeals analyzed in

*Viking Pump* differ significantly from the "death at any time" language at issue in the

instant case.  In *Viking Pump*, certain policies contained a non-cumulation of liability

provision, also referred to as an anti-stacking provision, which stated:

> If the same occurrence gives rise to personal injury . . . which occurs partly
> before and partly within any annual period of this policy, the[n] each
> occurrence limit and the applicable aggregate limit or limits of this policy
> shall be reduced by the amount of each payment made by [Liberty Mutual]
> with respect to such occurrence, either under a previous policy or policies
> of which this is a replacement, or under this policy with respect to previous
> annual periods thereof.

*Id*. at 252.

Similarly, the other relevant policies in *Viking Pump* contained a prior insurance

and non-cumulation of liability provision, which set forth:

> It is agreed that if any loss covered hereunder is also covered in whole or
> in part under any other excess Policy issued to the Insured prior to the
> inception date hereof[,] the limit of liability hereon . . . shall be reduced by
> any amounts due to the Insured on account of such loss under such prior
> insurance.
>
> Subject to the foregoing paragraph . . . in the event that personal injury . . .
> arising out of an occurrence covered hereunder is continuing at the time of
> termination of this Policy the Company will continue to protect the Insured
> for liability in respect of such personal injury . . . without payment of
> additional premium.

*Id*. at 252-53.

The Court of Appeals ultimately determined that all sums allocation of indemnity was required in *Viking Pump* due to the presence of the non-cumulation clauses, because those particular "policy provisions *plainly contemplate* that multiple successive insurance policies can indemnify the insured for the same loss or occurrence." *Id*. at 261 (emphasis added).

In the matter before this Court, the Primary Policies do not contain non-cumulation provisions, and the "death at any time" language is a far cry from *Viking Pump*'s clearly articulated non-cumulation clauses.  First, the relevant language in this case does not explicitly refer to <u>any</u> other or additional policies.  Second, even if this Court were to presume that the parties contemplated potential interaction with other policies during their negotiations of the definition of bodily injury in each of the Primary Policies, which it does not,[3] the language at issue does not explain how any reductions of liability should occur, if at all, in the event of overlapping coverage by multiple policies.

Contrary to API's suggestion, the Court does not find that pro rata allocation of indemnity in this case would render the "death at any time" language of the Primary Policies surplusage.  Dkts. 96-1, p. 28; 108, p. 6.  Rather, pro rata allocation might serve to slightly complicate an already complex mathematical equation designed to actualize the policy language that the parties have agreed to be bound by.  For

---

[3] The Insurers have asserted that the definition of bodily injury operative in the Primary Policies has been standard language in CGL policies since the mid-1960s. Dkt. 118, p. 25.  API does not dispute this point.  *See generally* Dkt. 120.

example, the classic time-on-the-risk formula[4] could be modified to include a secondary level pro rata allocation of liability attributed to wrongful death claims, so that each insurer on the risk during the pendency of the injury would be held liable for the damages associated specifically with the death.  While this is certainly not the simplest method of allocation, the Court is not at liberty to disregard the Primary Policy provisions for the sake of expediency.

Moreover, as noted in both Fireman's Fund and North River's reply in support of their joint motion for partial summary judgment on allocation and the Insurers' joint objections to the RR&O, an amicus brief in *Viking Pump* raised this precise issue, arguing that the "death at any time" language of the bodily injury definitions required all sums allocation.  Dkts. 103, p. 14-15; 118, p. 25.  Respondent insurers in *Viking Pump* disputed this contention, citing a 2013 Massachusetts appellate court case which found that "[t]he bodily injury definition simply sets forth the unremarkable proposition . . . that in the typical case where the time of injury is easily determined, the policy in place when the injury occurs will cover all consequential damages, even those taking place after the policy period."  *New England Insulation Co. v. Liberty Mut. Ins. Co.*, 988 N.E.2d 450, 454 (2013).

The Appeals Court of Massachusetts concluded that the "death at any time" language in the policies did not compel all sums allocation of indemnity in the case before it.  Notably, that case also concerned third-party asbestos bodily injury claims,

---

[4] The Second Circuit has defined the time-on-the-risk approach as requiring multiplication of "the judgment or settlement by a fraction that has as its denominator the entire number of years of the claimant's injury, and as its numerator the number of years within that period when the policy was in effect." *Stonewall*, 73 F.3d at 1202.

and plaintiff insured had explicitly likened the "death at any time" language in the definitions of bodily injury to non-cumulation clauses.  Nevertheless, the Court opined that non-cumulation clauses were "an express agreement" and accordingly were easily distinguishable from the "death at any time" language.  *Id*. at 455 n. 13.

Similarly, the New York Court of Appeals declined to broaden its *Viking Pump* ruling to state that the standard definition of bodily injury required all sums allocation of indemnity.  While this Court agrees with API's contention that the *Viking Pump* decision did not explicitly reject or analyze this issue (Dkt. 120, p. 21), it nevertheless finds that the Court of Appeals could have easily incorporated this position if it had actually intended to modify New York long-tail claims allocation law in such a drastic way. Instead, the *Viking Pump* Court chose to rely on the non-cumulation clauses to support its conclusion that all sums allocation of indemnity was required.

As this Court has determined that pro rata allocation must be applied to indemnification in the instant case, it must also consider Fireman's Fund and North River's argument that API is responsible for indemnification attributed to periods that it went without insurance coverage.  Dkt. 89-45, p. 16-18.  The Court has not identified any reason, based on a review of the pertinent Primary Policy language and case law, why API should not be considered on-the-risk for non-coverage periods.

As previously noted, the foundation for pro rata allocation is the "during the policy period" language contained within the Primary Policies.  As the New York Court of Appeals aptly reasoned in *Keyspan*, "to allocate risk to the insurer for years outside the policy period would be to ignore the very premise underlying pro-rata allocation."  *Id*. at 61.  In its decision assigning a pro rata share of indemnity to the insured, the Court of

11

Appeals also noted that not requiring pro rata contribution from the insured "would contravene the reasonable expectations of the average insured, who would not expect to receive coverage without regard to the number of years for which it purchased applicable insurance." *Id*. This Court agrees.

Turning next to allocation of defense costs, as both sides cited *Rapid-American* in support of their arguments, the Court's analysis will begin there.  It is true that the New York Court of Appeals has held, as noted by Fireman's Fund and North River in their joint motion for partial summary judgment on allocation, that when multiple policies are triggered by a particular claim, "pro-rata sharing of defense costs *may* be ordered." Dkt. 89-45, p. 18 (citing *Rapid-American*, 80 N.Y.2d at 655) (emphasis added).  It is also true that same decision held that:

> . . . the duty to defend is broader than the duty to pay, requiring each insurer to defend if there is an asserted occurrence covered by its policy, and the insured should not be denied initial recourse to a carrier merely because another carrier may also be responsible. That is the "litigation insurance" the insured has purchased.

*Id*.  Perhaps most significantly, the *Rapid-American* Court stated that when multiple policies are triggered by a particular claim, there was "no error or unfairness in declining to order [pro rata] sharing, with the understanding that the insurer may later obtain *contribution from other applicable policies*." *Id*. at 655-56 (emphasis added).

Put another way, API is entitled to a full defense pursuant to the Primary Policies, whereas "whatever obligations or rights to contribution may exist between two or more insurers . . . flow from equitable principles." *Md. Cas. Co. v. W.R. Grace & Co*., 218 F.3d 204, 211 (2d Cir. 2000).

As previously discussed, New York law requires adherence to policy terms, and equitable principles cannot serve to modify explicitly agreed upon contract provisions. As such, API has the stronger argument on allocation of defense costs.

Fireman's Fund and North River relied heavily on the relatively recent *Danaher Corp.* case for support of their position that pro rata allocation of defense is appropriate in the instant case.  However, that non-binding Southern District of New York decision appears to have relied on considerations of equity and efficiency rather than analyzing the issue with a primary focus on the policy language itself.  Furthermore, to arrive at its conclusion that the insured must contribute to defense costs on a pro rata basis, *Danaher* itself relied on the reasoning of a Sixth Circuit decision, *Insurance Co. of North America v. Forty-Eight Insulations*, 633 F.2d 1212 (6th Cir. 1980), which pre-dates *Rapid-American*.

In light of the fact that no binding precedent requires this Court to allocate defense costs on a pro rata basis, and because the plain language of the Primary Policies requires the Insurers to pay all costs and expenses that arise from defending any claim or suit which seeks damages on account of a covered occurrence, all sums allocation of defense costs is required in this case.

Switching gears now to API's objection concerning its argument in the alternative, that the three subsidiaries created in September 1996 – API Basco Inc., API AirTech Inc., and API Heat Transfer Inc. – qualify for coverage under the "Subsidiaries or Newly Acquired or Formed Organizations" provision of Federal's April 1, 1996 policy, the Court agrees with the RR&O that summary judgment should be denied on this ground.  The Court finds that the Insurers have been deprived of a full and fair

opportunity to explore this issue in discovery insofar at this argument is not alluded to in API's Complaint.  Furthermore, the Magistrate Judge previously denied API's request to amend the Complaint in this manner, finding the amendment was untimely and prejudicial.  Dkt. 86.  As such, this issue is not ripe for summary judgment.

If the issue were properly before the Court at this stage, the Magistrate Judge's recommendation would require modification, insofar at the Court recognizes that enforceable policy exclusions must be specific and only subject to one reasonable interpretation.  *See, e.g., Seaboard Sur. Co. v. Gillette Co.*, 64 N.Y.2d 304, 311 (1984).  Because the Insurers did not meet their burden in this regard, the exclusion cannot be applied in this case.

However, this issue is not ripe and furthermore, it is unclear whether API has standing to assert claims for coverage as to its three former subsidiaries.

On the issue of payments that API has already made in settlement of certain of the Asbestos Lawsuits (also referred to in this matter at the issue of voluntary payments), the Court adopts the Magistrate Judge's conclusion that API is entitled to indemnification, on a pro rata basis, for the reasons articulated in the RR&O.  Dkt. 133, p. 27-28.

Finally, with respect to the Insurers' argument that API is not entitled to coverage on a contractual indemnity theory, this appears to be moot as API has not raised such an argument and the parties' objections do not encompass this issue.

Accordingly, it is hereby

ORDERED that the RR&O is ADOPTED in part, REJECTED in part, and MODIFIED in part, consistent with the foregoing; and more specifically it is

ORDERED that Defendants' motion to strike (Dkt. 109) Plaintiff's reply in support of its cross-motion for summary judgment is DENIED; and it is

ORDERED that Defendants' joint motion for summary judgment on the (1) named insured, (2) standing, and (3) contractual indemnity issues (Dkt. 90) is DENIED; and it is

ORDERED that Defendants' joint motion for summary judgment on statute of limitations grounds (Dkt. 91) is DENIED; and it is

ORDERED that Fireman's Fund and North River's joint motion for partial summary judgment on allocation and voluntary payments (Dkt. 89) is GRANTED, in part, as to their argument that pro rata allocation of indemnity is required in this case, and DENIED as to their arguments that pro rata allocation of defense costs is required, and that Plaintiff's voluntary payments place them outside the scope of coverage; and it is

ORDERED that Plaintiff's motion for summary judgment (Dkt. 87) is GRANTED, in part, as to its arguments that the Primary Policies require Defendants to defend the Asbestos Lawsuits and contribute to past and future indemnification, and DENIED, in part, as to its alternative argument concerning newly formed subsidiaries; and it is

ORDERED that Plaintiff's cross-motion for summary judgment (Dkt. 96) is GRANTED, in part, as to its arguments that Defendants are required to defend the Asbestos Lawsuits on an all sums basis, without future contribution from Plaintiff, and DENIED, in part, as to its argument that indemnification must be allocated on an all sums basis; rather, indemnification of both the previously settled claims and all future settlements and judgments must be allocated on a pro rata basis; and it is

SPA-46

ORDERED that the matter is remanded to Magistrate Judge H. Kenneth Schroeder, Jr. for further proceedings.

**IT IS SO ORDERED**.

_s/Richard J. Arcara_____
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated: December 21, 2022

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════════

AMERICAN PRECISION INDUSTRIES, INC.,

                    Plaintiff,

          v.                                    **DECISION AND ORDER**
                                                14-CV-1050

FEDERAL INSURANCE COMPANY,
FIREMAN'S FUND UNSURANCE COMPANY,
AND NORTH RIVER INSURANCE COMPANY,

                    Defendants.

═══════════════════════════════════


        Plaintiff American Precision Industries, Inc. ("API" or "Plaintiff") brought this

action seeking a declaratory judgment that Federal Insurance Company ("Federal"),

Fireman's Fund Insurance Company ("Fireman's Fund"), and North River Insurance

Company ("North River") (collectively, "the Insurers" or "Defendants") must defend and

indemnify API in several hundred asbestos-related personal injury lawsuits ("Asbestos

Lawsuits"), as well as reimburse API for all litigation costs it has already incurred with

respect to those suits.

        In a Decision and Order dated December 21, 2022 (the "Prior Order"), the Court,

amongst other things, denied various motions for summary judgment that were filed

jointly by Defendants, including an argument based on their named insured theory;

granted Fireman's Fund and North River's joint motion for partial summary judgment on

allocation and voluntary payments as to their argument that pro rata allocation of

indemnity is required and denied the motion as to their arguments that pro rata allocation of defense costs is required and that Plaintiff's voluntary payments placed them outside the scope of coverage; and granted Plaintiff's cross-motion for summary judgment as to its argument that Defendants are required to defend the Asbestos Lawsuits on an all sums basis, and denied the motion as to the argument that indemnification must be allocated on an all sums basis.

On January 5, 2023, North River and Fireman's Fund moved to amend the Prior Order to certify questions pertaining to the named insured issue and the allocation of defense costs for interlocutory appeal pursuant to 28 U.S.C. § 1292(b). Shortly thereafter, Federal filed a motion for leave to join the motion to amend. Plaintiff API filed a brief fashioned as both an opposition to the motion to amend and a cross-motion to amend the Prior Order to certify a question regarding the allocation of indemnity pursuant to 28 U.S.C. § 1292(b). Federal's motion to join is hereby GRANTED, and for the reasons set forth below, the motions to amend the Prior Order are GRANTED.

## BACKGROUND

The Court assumes familiarity with the history of this litigation, the Prior Order, and the pending motions; however, it will briefly summarize for the convenience of the reader. The Defendant Insurers issued primary comprehensive general liability ("CGL") policies ("the Primary Policies") to Plaintiff API covering slightly more than half the time between December 31, 1974 and April 1, 1997. The Asbestos Lawsuits allege third-party bodily injuries, including hundreds of deaths, resulting from pre-1996 exposure to asbestos products, such as heat exchangers, which were manufactured and/or sold by

API.  Between 2002 and October 2017, at least 769 Asbestos Lawsuits had been filed. Only one of those Asbestos Lawsuits named API as a defendant.

API was incorporated in 1947 and has a complex corporate history.  Of particular salience is the evolution of Heat Transfer because that entity and Danaher Corporation are generally named as defendants in the Asbestos Lawsuits.  Prior to September 1996, Heat Transfer was a group within API, itself further comprised of divisions, including Air Technologies and Basco.  In September 1996, Heat Transfer became a subsidiary of API.  It is of paramount significance that no liabilities were conveyed from API to the Heat Transfer subsidiary.  In 2000, Danaher Corporation acquired API but likewise did not assume any liabilities.

The Primary Policies do not contain asbestos exclusions.  Although there are minor differences in language and coverage, the Primary Policies all provide that Defendants have a duty to defend any suit against the insured seeking damages on account of bodily injury.  Further, the Primary Policies all define "bodily injury" as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom," or functionally equivalent language.

Amongst other arguments set forth in their joint motions for summary judgment, Defendants asserted that API was not entitled to any coverage under the Primary Policies because it was the sole named insured but was not a named defendant in the Asbestos Lawsuits.  The Court adopted the Magistrate Judge's recommendation to deny Defendant's motion on this ground, stating that in light of extrinsic facts known to the Defendants – namely, that API had retained liability – the policy language compelled

coverage, regardless of which entities were named within the four corners of the complaints filed in the Asbestos Lawsuits.

The Court also adopted the Magistrate Judge's recommendation to grant Plaintiff's cross-motion for summary judgment as to its argument that Defendants are required to defend the Asbestos Lawsuits on an all sums basis, otherwise known as joint and several allocation, as well as his corresponding recommendation to deny Fireman's Fund and North River's joint motion for partial summary judgment on the argument that pro rata allocation of defense costs is required.  This Court found that the Primary Policies required Defendants to pay all costs and expenses arising from the defense of any claim or suit which seeks damages on account of a covered occurrence. Additionally, the Court found *Danaher Corp. v. Travelers Indem. Co.*, 414 F. Supp. 3d 436 (S.D.N.Y. 2019) inapt, and therefore determined that while contribution could later be sought amongst the insurers, claims for future contribution from Plaintiff were barred.

Finally, as relevant here, the Court rejected the Magistrate Judge's recommendation to deny Fireman's Fund and North River's joint motion for partial summary judgment on their argument that pro rata allocation of indemnity is required, and his corresponding recommendation to grant Plaintiff's cross-motion for summary judgment as to its argument that Defendants must indemnify on an all sums basis.  In rejecting Plaintiff's argument, which relied heavily on the New York Court of Appeals decision *In re Viking Pump, Inc.*, 27 N.Y.3d 244 (2016), this Court found that the "death at any time" language contained in the Primary Policies' definitions of bodily injury was distinguishable from the non-cumulation clauses relevant in *Viking Pump* because those latter "policy provisions *plainly contemplate[d]* that multiple successive insurance

policies [could] indemnify the insured for the same loss or occurrence." *Id.* at 261 (emphasis added).  Accordingly, the Court rejected what it viewed as the false dichotomy API presented of either the "death at any time" language requiring all sums allocation of indemnity or that same contract language being rendered surplusage.

<u>The Instant Motions</u>

Defendants move pursuant to 28 U.S.C. § 1292(b) to amend the Prior Order to certify for interlocutory appeal questions pertaining to the named insured issue and the allocation of defense costs.  Plaintiff filed a brief opposing the motion to amend and cross-moving to amend the Prior Order to certify a question regarding the allocation of indemnity pursuant to 28 U.S.C. § 1292(b), but only if the Court certifies either or both of the questions proposed by Defendants.

Section 1292(b) provides:

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: Provided, however, That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

**DISCUSSION**

Interlocutory appeals are strongly disfavored in federal practice.  A party seeking certification bears the burden of demonstrating that the requirements of § 1292(b) are met, but even if the party meets its burden, "district courts should only grant leave for an

interlocutory appeal after 'exercising great care.'"  *Stratton v. Wallace*, 11-CV-74, 2016 WL 3552147, at *2 (W.D.N.Y. Apr. 5, 2016) (quoting *Westwood Pharms., Inc. v. Nat'l Fuel Gas Distrib. Corp.*, 964 F.2d 85, 89 (2d Cir. 1992).

A district court may certify an order for interlocutory appeal if the movant establishes "that the order (1) 'involves a controlling question of law' about which (2) 'there is substantial ground for difference of opinion,' and (3) 'an immediate appeal from the order may materially advance the ultimate termination of the litigation.'"  *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 14-MD-2589, 2019 WL 3202745, at *1 (S.D.N.Y. July 16, 2019) (quoting 28 U.S.C. § 1292(b)).  Furthermore, "only 'exceptional circumstances [will] justify a departure from the basic policy of postponing appellate review until after the entry of a final judgment.'"  *Klinghoffer v. S.N.C. Achille Lauro*, 921 F.2d 21, 25 (2d Cir. 1990) (quoting *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 475 (1978)).

If all three elements of § 1292(b) have been established, the certification decision is still "entirely a matter of discretion for the district court."  *In re Roman Catholic Diocese of Albany, New York, Inc.*, 745 F.3d 30, 36 (2d Cir. 2014).  However, "[w]hen a ruling satisfies these criteria and 'involves a new legal question or is of special consequence,' then the district court 'should not hesitate to certify an interlocutory appeal.'"  *Balintulo v. Daimler AG*, 727 F.3d 174, 186 (2d Cir. 2013) (quoting *Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100, 111 (2009)).

1.  Controlling Question

"Courts in this Circuit typically evaluate whether a controlling question of law exists by considering whether either (1) 'reversal of the district court's opinion could

result in dismissal of the action'; (2) 'reversal of the district court's opinion, even though not resulting in dismissal, could significantly affect the conduct of the action,' or (3) 'the certified issue has precedential value for a large number of cases.'" *Green v. Humana at Home, Inc.*, 16-CV-7586, 2019 WL 3729390, at *3 (S.D.N.Y. Aug. 8, 2019) (quoting *In re A2P SMS Antitrust Litig.*, 12-CV-2656, 2015 WL 876456, at *3-4 (S.D.N.Y. Mar. 2, 2015)).  Courts also require that a controlling question of law present "a 'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record."  *United States ex rel. Quartararo v. Catholic Health Sys. of Long Island Inc.*, 521 F.Supp.3d 265, 275 (E.D.N.Y. 2021) (citing *Fairbank Recons. Corp. v. Greater Omaha Packing Co., Inc.*, 13-CV-907, 2020 WL 7427025, at *4 (W.D.N.Y. Dec. 18, 2020)).

    a.  Named Insured

Defendants argue that a ruling in their favor on this issue would terminate the litigation.  API disputes this contention, but agrees that it is a controlling question of law, presumably on the grounds that it could significantly affect the remainder of the action.  This Court agrees the first element of § 1292(b) has been satisfied as to this pure question of law.

    b.  Allocation of Defense Costs

Next, Defendants assert that a ruling in their favor on this issue, which does not involve any disputed facts, would reduce the duration, scope, and expense of proceedings before this Court.  Again, Plaintiff concedes that the issue is a controlling question of law, and this Court agrees this element of § 1292(b) has been satisfied because a decision on appeal could significantly impact the conduct of this case.

c. Allocation of Indemnity

Plaintiff argues that this issue is not clouded by any disputed facts, and that it has a direct impact on the responsibility of Defendants to cover indemnification as well as whether API can be required to contribute thereto. In reply to Plaintiff's cross-motion, North River and Fireman's Fund do not directly respond to whether this issue is a controlling question of law; rather, they assert that the value of indemnification in this case is so insignificant as to be *de minimis*. This Court finds that the issues of allocation of defense and indemnification are closely related and agrees with Plaintiff that it would make little sense to certify one question and not the other as both must be resolved to reduce the duration and expense of this action. Accordingly, the Court finds that the first element of § 1292(b) has been satisfied as to this pure question of law.

2. <u>Substantial Ground for Difference of Opinion</u>

As noted in Defendants' joint memorandum, a substantial ground for difference of opinion exists when "(1) there is conflicting authority on the issue, or (2) the issue is particularly difficult and of first impression for the Second Circuit." *Pen Am. Ctr., Inc. v. Trump*, 18-CV-9433, 2020 WL 5836419, at *2 (S.D.N.Y. Oct. 1, 2020) (quoting *Whyte v. Wework Companies, Inc.*, 20-CV-1800, 2020 WL 4383506, at *1 (S.D.N.Y. July 31, 2020).

The Second Circuit has stated that "the mere presence of a disputed issue that is a question of first impression, standing alone, is insufficient to demonstrate a substantial ground for difference of opinion." *In re Flor*, 79 F.3d 281, 284 (2d Cir. 1996). However, the Circuit has since clarified that when the other elements of § 1292(b) have been established and the question "involves a new legal question or is of special

consequence, then the district court should not hesitate to certify an interlocutory appeal." *Balintulo*, 727 F.3d at 186.

a.  Named Insured

Defendants assert that this issue presents new legal questions – specifically, whether – and if so, when – policy obligations are triggered by third-party lawsuits that do not name as a defendant the insured or its successors, assigns, or alter egos.  The Court's Prior Order relied on the New York Court of Appeals case *Fitzpatrick v. Am. Honda Motor Co.*, 78 N.Y.2d 61 (1991) to reach its conclusion, but Defendants argue even that case required the defendant to have been named in the third-party complaint, albeit in the wrong role, which is how that coverage dispute arose.

In response, Plaintiff states that Defendants have misconstrued the holding of *Fitzpatrick*, wrongly narrowing it to assert that coverage cannot be denied to a named defendant whose role was simply misidentified in the third-party complaint.  Plaintiff contends the Court of Appeals focused on the underlying event, rather than the named defendants, to determine who was liable for the alleged wrongdoing, thereby triggering coverage.  Additionally, Plaintiff asserts that Defendants were unable to identify any conflicting authority on this issue because it is settled New York law.

After analyzing the strength of Defendants arguments, this Court concludes Defendants have satisfied their burden as to the second element.  Defendants' memorandum notes that before the Prior Order was issued, "no court had ever held that New York law requires coverage for an entity not actually named as a defendant to a case." Dkt. 138-1 at 15-16.  The issues are of first impression in the Second Circuit and surely, they rise to the level of special consequences as they could significantly expand

the scope of coverage insurers must provide.  While the Court finds the logic of
*Fitzpatrick* to be clear, it is also cognizant that its application of said logic to the facts of
this case stretched the Primary Policies' language, which states that Defendants "shall
have the right and duty to defend any suit against the insured seeking damages . . .,"
rather thin.

      b.  Allocation of Defense Costs

      Defendants assert that this issue is one of first impression in the Western District
of New York, and therefore of substantial import and precedential value.  Specifically,
they argue that the Prior Order renders them responsible for the defense of claims for
which there is no concomitant indemnity obligation, in contravention of the policy
language.  They rely on the unreported case *Mt. McKinley Ins. Co. v Corning Inc.*,
602454/02, 2012 N.Y. Slip Op. 33555(U) (N.Y. Sup. Ct., Sept. 7, 2012), to which North
River was a party, noting that court determined pro rata allocation of defense fees was
required because the all sums alternative would "force an insurer to pay for that portion
of the defense costs attributable to [the insured] (for periods when it chose to self-
insure) and to an insolvent primary level insurer."  Dkt. 138-1 at 18.

      They also cite *Columbus McKinnon Corp. v. Travelers Indem. Co.*, 367 F. Supp.
3d 123 (S.D.N.Y. 2018) arguing that post-*Viking Pump*, courts applying New York law
still require pro rata allocation of defense when indemnity coverage is limited to injuries
during the policy period.  Additionally, Defendants point to *National Hockey League v.
TIG Ins. Co.*, 76 Misc.3d 427 (S. Ct., New York County 2022) for evidence that New
York State courts agree that insurers cannot be required to pay defense costs for
occurrences which took place outside of their policy periods.  That court found it would

"subvert the contracts and obviate the NHL's obligation to cover the defense costs 'allocable to any years in which [it] went without coverage.'" *Id*. at 436 (citing *Danaher*, 414 F. Supp. 3d at 454).

Finally, Defendants assert that the portion of the Prior Order preventing Defendants from seeking future contribution from Plaintiff for defense costs "contravenes Second circuit caselaw," and cite only *Olin Corp. v. Insurance Co. of North America*, 221 F.3d 307 (2d Cir. 2000) for support.

Plaintiff argues that decisions issued by other federal district courts and New York State trial courts cannot be a substantial basis for difference of opinion on the issue.  Moreover, it points out that the policy language does not say that the insurers will "defend that ***portion*** of a claim to which the insurance applies."  Dkt. 142-1 at 9 (emphasis in original).  This point is particularly meaningful against the backdrop of *Continental Cas. Co. v. Rapid-American Corp.*, 80 N.Y.2d 640 (1993), wherein the New York Court of Appeals determined that the duty to defend was broader than the duty to indemnify.  Plaintiff also asserts that "[i]t is an indisputable tenet of New York law that an insurer with a duty to defend must defend an entire claim, even if it alleges both covered and uncovered claims."   Dkt. 142-1 at 15 (citing *Frontier Ins. Contractors, Inc. v. Merchs. Mut. Ins. Co.*, 91 N.Y.2d 169 (1997).

Additionally, Plaintiff notes that many of the cases relied on by Defendants, including *Olin Corp.*, do not address allocation of defense at all; rather, they focus their analysis on allocation of indemnity.  With respect to *Mt. McKinley*, Plaintiff argues that court deemed the contract language non-dispositive, and therefore relied on equitable considerations in allocating defense costs.  Because that court found the insured had

"elected, but ma[d]e[ ] no argument that it ha[d] been forced, to self-insure certain risks and amounts during relevant time periods," it found all sums allocation of defense would provide a benefit to the insured that had not been bargained for.  Plaintiff reminds the Court that in the instant case, there have been no admissions or factual findings that it elected to forego insurance during the relevant period.[1]

This Court has exercised great care in evaluating the arguments made by the parties.  Although it agrees with Plaintiff that there is no controlling precedent in conflict with its Prior Order on this issue, it does find conflicting authority on the issue exists.  Furthermore, it finds this question is of special consequence as a difficult matter of first impression in the Western District of New York.  The Court finds it is also of special consequence because there is a paucity of relevant caselaw outside the district to provide guidance on the issue.  Accordingly, this Court concludes that the second element of § 1292 has been met with respect to this issue.

c.  Allocation of Indemnity

Plaintiff argues that the effect of the "death at any time" language on allocation of indemnity is an issue of first impression in the Second Circuit.  It asserts that this Court incorrectly restricted application of the principles of *Viking Pump*, which it argues readily apply to policy provisions other than non-cumulation and continuing coverage clauses.  Specifically, it resuscitates its argument that the "death at any time" language would be rendered surplusage under pro rata allocation, as subsequent deaths would be allocated to the policy period in which they occurred.

---

[1] The Court notes, however, that for significant periods during the relevant timeframe, API was covered by insurers that are now insolvent.  *See, e.g.*, Dkt. 90-1 at ¶¶ 73-79.

In addition, Plaintiff brings two cases to the Court's attention as the only existing authorities that Plaintiff is aware of addressing this question: one issued by a California court and another by a federal district court in California, both applying New York law. Plaintiff asserts both courts reached the conclusion that "death at any time" language was inconsistent with pro rata allocation in the wake of *Viking Pump*.  *See Cannon Electric, Inc. v. Ace Property & Casualty Co.*, 2017 Cal. Super. LEXIS 8981 (Aug. 17, 2017); *POLAR-Mohr Maschinenvertriebsgesellschaft GmbH & Co. KG v. Zurich Am. Ins. Co.*, 2018 U.S. Dist. LEXIS 42955, (N.D. Ca. Mar. 15, 2018).  Finally, Plaintiff contends that this Court improperly relied on *New England Insulation Co. v. Liberty Mut. Ins. Co.*, 83 Mass. App. Ct. 631 (2013) insofar as the Massachusetts Supreme Judicial Court had already expressed a preference for pro rata allocation prior to that decision being rendered.

In response, North River and Fireman's Fund assert that there have been no New York cases which have adopted API's argument on the "death at any time" language.  They cite *Liberty Mut. Fire Ins. Co. v. J&S Supply Corp.*, 2017 U.S. Dist. LEXIS 162910 (S.D.N.Y. Sept. 29, 2017) as evidence that pro rata allocation is appropriate in the context of insurance litigation involving the "death at any time" provision, despite *Viking Pump*.  Specifically, they argue the *J&S* Court distinguished *Viking Pump* from the case before it based on the presence of non-cumulation and prior insurance provisions in the *Viking Pump* policies.

The issue of allocation of indemnification is not only particularly difficult, but as with the allocation of defense costs issue, there is little relevant caselaw examining it. In the Court's analysis of this issue in its Prior Order, it specifically noted that it was

deciding a matter of first impression. Moreover, the cases relied on by the parties in their briefs to amend the Prior Order underline that conflicting authority on the issue exists. Finally, this issue is of special consequence. This is because the "death at any time" language has been standard in CGL policies for several decades, which means a determination that such language forecloses the application of pro rata allocation of indemnity would essentially preclude pro rata indemnity allocation in all long-tail claims applying New York law going forward. Since this Court finds substantial grounds for difference of opinion as to whether *Viking Pump* intended to do just that, it concludes that Plaintiff has met its burden as to this second element.

### 3. Materially Advance the Ultimate Termination of the Litigation

Application of § 1292(b) is reserved for cases where "an immediate appeal may avoid protracted litigation." *Koehler v. Bank of Bermuda*, 101 F.3d 863, 866 (2d. Cir 1996). Moreover, although the question of whether there is a controlling issue of law is distinct from this question of whether certification would materially advance the ultimate termination of the litigation, "in practice the two questions are closely connected." *SEC v. Credit Bancorp, Ltd.*, 103 F. Supp. 2d 223, 227 (S.D.N.Y. 2000).

#### a. Named Insured

As previously noted, Defendants argue that a ruling in their favor on this issue would absolve them from covering defense costs and indemnification pertaining to the Asbestos Lawsuits. API disagrees, asserting that it was previously named in one Asbestos Lawsuit and could be so named in the future, therefore its request for declaratory judgment would not be moot even if the Second Circuit found in Defendants' favor on this issue. Because interlocutory appeal of this issue may avoid protracted

litigation by significantly limiting the scope of this case, this Court finds the final element of § 1292(b) has been satisfied.

      b.   Allocation of Defense Costs

      Defendants argue that appellate reversal on this issue would streamline the remainder of the case.  They also contend the litigation will necessarily be expanded under all sums allocation of defense because whichever insurer Plaintiff collects coverage from will amend its Answer to assert cross-claims against the other insurers for contribution.  Finally, Defendants opine that a ruling from the Second Circuit could facilitate settlement.

      Plaintiff responds that the instant litigation is not the forum for the Insurers to resolve future claims for contribution, and that any such amendment should be barred.

      Bearing in mind that the matter is only theoretical at this juncture, the Court does not agree with Plaintiff that such amendment of the pleadings would be categorically barred.  As such, this Court finds that immediate appeal of this issue may avoid prolonged litigation and finds Defendants have met their burden as to this third element.

      c.   Allocation of Indemnity

      Plaintiff asserts that interlocutory appeal of the named insured and defense cost allocation issues will not advance the ultimate resolution of this case unless the allocation of indemnity issue is similarly resolved.  North River and Fireman's Fund do not respond directly; rather, as noted above, they assert that the value of indemnification is *de minimis* and therefore does not warrant burdening the Second Circuit.  Because the issues of allocation of defense and indemnification are closely related, this Court finds that both must be resolved to avoid protracted litigation.  As

such, this Court finds that the third element of § 1292(b) has been satisfied as to this issue.

**CONCLUSION**

For the reasons set forth above, the Court concludes that certification of these three issues for interlocutory appeal is appropriate under the framework of 28 U.S.C. § 1292(b).  Furthermore, the Court finds that exercising its discretion to allow certification is appropriate under the circumstances of this case.

Accordingly, Federal's motion (Dkt. 141) to join Fireman's Fund and North River's joint motion (Dkt. 138) to amend the Prior Order (Dkt. 137) is GRANTED; and

Defendants' joint motion (Dkt. 138) to amend the Prior Order is GRANTED.  The Prior Order is deemed amended to certify the following questions for immediate review:

(1) Whether – and if so, when – policy obligations are triggered by third-party lawsuits that do not name as a defendant the insured or its successors, assigns, or alter egos, but where the insurers have notice that the insured retained liability for the harms alleged in the third-party suits; and

(2) Whether insurers can be required to pay defense costs for long-tail claims on an all sums basis where the policy language limits indemnification to harms occurring during the policy period.

Additionally, Plaintiff's cross-motion (Dkt. 142) to amend the Prior Order is GRANTED.  The Prior Order is deemed amended to also certify the following question for immediate review:

SPA-63

(1) Whether *Viking Pump* precludes pro rata allocation of indemnification where the insurance policy definition of bodily injury includes "death at any time" language.

Finally, the parties shall notify the Court when the Second Circuit either declines to accept these questions for interlocutory review or when it reaches decisions on the merits of the certified questions.

**IT IS SO ORDERED**.

_s/Richard J. Arcara_____
HONORABLE RICHARD J. ARCARA
UNITED STATES DISTRICT COURT

Dated: November 20, 2023